## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RON ESTES, Treasurer of the State of
Kansas
900 SW Jackson, Suite 201
Topeka, KS 66612

RICHARD SATTGAST, Treasurer of the
State of South Dakota
500 E Capitol Avenue, Suite 212
Pierre, SD 57501

JOHN NEELY KENNEDY, Treasurer of
the State of Louisiana
900 North Third Street, Third Floor
Baton Rouge, LA 70802

LYNN FITCH, Treasurer of the State of
Mississippi
501 North West Street, Suite 1101
Jackson, MS 39201

ALLISON BALL, Treasurer of the
Commonwealth of Kentucky
1050 U.S. Highway 127 South, Suite 100
Frankfort, KY 40601

        Plaintiffs,

   v.

U.S. DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

U.S. DEPARTMENT OF THE
TREASURY, BUREAU OF THE FISCAL
SERVICE
401 14th Street, SW
Washington, D.C. 20227

JACOB LEW, in his official capacity as
Secretary of the Treasury

Civ. No. _____

1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

DAVID LEBRYK, in his official capacity
as Fiscal Assistant Secretary
401 14th Street, SW
Washington, D.C. 20227

SHERYL MORROW, in her official
capacity as Commissioner of the Bureau of
the Fiscal Service
401 14th Street, SW
Washington, D.C. 20227

                    Defendants.

# COMPLAINT

Plaintiffs Ron Estes, Treasurer of the State of Kansas; Richard Sattgast, Treasurer of the State of South Dakota; John Neely Kennedy, Treasurer of the State of Louisiana; Lynn Fitch, Treasurer of the State of Mississippi; and Allison Ball, Treasurer of the Commonwealth of Kentucky (collectively, "Plaintiffs"), for a Complaint by and through their attorneys, allege as follows:

# INTRODUCTION

1.      This action seeks declaratory and injunctive relief to set aside final rules amending regulations governing U.S. savings bonds ("bonds") promulgated by the U.S. Department of Treasury ("Treasury"), Bureau of the Fiscal Service ("Bureau"), on December 24, 2015.  *See* Regulations Governing United States Savings Bonds, 80 Fed. Reg. 80,258 (Dec. 24, 2015) ("Final Rules").  The Final Rules govern Treasury's treatment of matured, unredeemed bonds to which states have escheated title under state law.  For decades, Treasury's regulations have provided that a state that escheats title to a bond may redeem the bond for value as the

bond's rightful owner.  The Final Rules represent a sharp, unacknowledged, and unjustified departure from that longstanding policy.  The Rules are thus arbitrary, capricious, and unlawful. The Final Rules should be set aside.

2.      For more than 60 years before Treasury promulgated the Final Rules, Treasury's settled and repeated policy was that it would redeem for value bonds to which states had escheated title under state law.  Treasury documented this policy in multiple agency statements and in litigation, including before the Supreme Court of the United States.  Moreover, the United States Court of Federal Claims has held that Treasury's regulations required it to recognize states' ownership of — and right to redeem — escheated bonds.  *See Estes v. United States*, 123 Fed. Cl. 74 (2015).

3.      Treasury upended this longstanding policy in the Final Rules.  The Final Rules provide that Treasury will "disallow[]" all "escheat claims for 'unclaimed' bonds that are not in a state's possession."  *Id*. at 80,261.  With respect to bonds that are in the state's possession, Treasury may — as a matter of its discretionary waiver authority — recognize state escheat claims, but only when Treasury determines that the state satisfied "Due process" requirements. *Id*. at 80,263-64.  The Final Rules further assert that state escheat proceedings will never, under any circumstances, be recognized as one of the "valid, judicial proceedings" capable of establishing a claim of ownership in a bond.  *Id*. at 80,264-65.

4.      Nowhere in the Final Rules does Treasury acknowledge that it has changed course.  Beyond that omission (itself grounds for invalidation), Treasury's explanation for its shift — that it is "protect[ing] the rights of savings bond owners," *id*. at 80,260 — does not withstand scrutiny.

5.      The Final Rules must also be set aside because they are substantively unlawful. The challenged provisions provide for Treasury's review of final, state-court judgments properly made only by the Supreme Court, in violation of 28 U.S.C. § 1257 and Supreme Court precedent.  The provisions also create a second, less favored tier of bond ownership for states, in violation of the Tenth Amendment.  In addition, the challenged provisions violate both Article VIII, Section 8, Clause 2 of the Constitution and the Fourteenth Amendment by repudiating Treasury's obligations pursuant to its bond contracts with state bond owners, and with the owners of all bonds issued and fully matured before Treasury promulgated the Final Rules.

6.      For these reasons, and for the reasons set forth below, Plaintiffs respectfully request that this Court hold unlawful and set aside the Final Rules, enjoin Treasury from enforcing the Final Rules or giving them effect in any manner, and order such other relief as may be appropriate.

## **PARTIES**

7.      Plaintiff Ron Estes is Treasurer of the State of Kansas.  In this capacity, Plaintiff Estes is the state official having responsibility for unclaimed property in Kansas, and for and undertaking judicial escheatment procedures pursuant to Kansas law.  Plaintiff Estes sues in his official capacity.

8.      Plaintiff Richard Sattgast is Treasurer of the State of South Dakota.  In this capacity, Plaintiff Sattgast is the state official having responsibility for unclaimed property in South Dakota, and for and undertaking judicial escheatment procedures pursuant to South Dakota law.  Plaintiff Sattgast sues in his official capacity.

9.      Plaintiff John Neely Kennedy is Treasurer of the State of Louisiana.  In this capacity, Plaintiff Kennedy is the state official having responsibility for unclaimed property

in Louisiana, and for and undertaking judicial escheatment procedures pursuant to Louisiana law. Plaintiff Kennedy sues in his official capacity.

10.     Plaintiff Lynn Fitch is Treasurer of the State of Mississippi. In this capacity, Plaintiff Fitch is the state official having responsibility for unclaimed property in Mississippi, and for and undertaking judicial escheatment procedures pursuant to Mississippi law. Plaintiff Fitch sues in her official capacity.

11.     Plaintiff Allison Ball is Treasurer of the Commonwealth of Kentucky. In this capacity, Plaintiff Ball is the state official having responsibility for unclaimed property in Kentucky, and for and undertaking judicial escheatment procedures pursuant to Kentucky law. Plaintiff Ball sues in her official capacity.

12.     As State Treasurers, Plaintiffs are dedicated to leveraging the unclaimed property laws of their respective states to provide for the safekeeping of abandoned property and then to reunite unclaimed property with rightful owners. In bringing this lawsuit, Plaintiffs seek to vindicate the rights and interests of their resident bondholders by removing an unlawful regulatory roadblock to state escheat claims.

13.     Defendant Treasury is an administrative agency of the United States Government. Treasury is headquartered in Washington, D.C. Defendant Bureau is the Division of the Treasury responsible for administering the U.S. savings bond program. The Bureau is headquartered in Washington, D.C.

14.     Defendant Jacob Lew is the Secretary of Treasury. His official address is in Washington, D.C. He is being sued in his official capacity. In that capacity, Secretary Lew has responsibility for oversight of the activities of the Bureau, including its administration of the U.S. savings bond program.

15.     Defendant Lebryk is the Fiscal Assistant Secretary.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Fiscal Assistant Secretary Lebryk has responsibility for oversight of the activities of the Bureau, including its administration of the U.S. savings bond program.

16.     Defendant Morrow is the Commissioner of the Bureau.  Her official address is in Washington, D.C.  She is being sued in her official capacity.  In that capacity, Commissioner Morrow is directly responsible for the administration of the U.S. savings bond program.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 500, *et seq*.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action all arise under the laws of the United States.

18.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants Treasury and Bureau reside in this judicial district; Defendants Lew, Lebryk, and Morrow perform their official duties in this judicial district; and a substantial part of the events giving rise to this action occurred in this judicial district.

19.     This Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

20.     This Complaint is timely under 28 U.S.C. § 2401(a).

## BACKGROUND

### U.S. Savings Bonds

21.     Article VIII, Section 8, Clause 2 of the Constitution empowers the federal government to "borrow money on the credit of the United States."

22.     Under this grant of power, Congress has authorized Treasury to "issue savings

bonds and savings certificates of the United States Government," 31 U.S.C. § 3105(a), and to

establish the terms and conditions that govern the savings bond program, *see id*. § 3105(c).

Treasury's bond regulations implement this authority.

23.     U.S. savings bonds are express contracts between the bond owner and the United

States. *Rotman v. United States*, 31 Fed. Cl. 724, 725 (1994).  Treasury's bond regulations

constitute the terms of each of these contracts. *Wolak v. United States*, 366 F. Supp. 110, 110

(D. Conn. 1973).

24.     Treasury began selling bonds between the First World War and Second World

War.  Bonds are issued in various "Series," each series represented by a letter (or letters) of the

alphabet, such as A, E, and HH.  The maturity terms for most series of bonds are lengthy,

typically 30-40 years, and many of the bonds were first issued as far back as 1935, 1941, 1951,

and 1952, making many bonds well over 60, and in some cases 80, years old.  These long

maturities mean that registered owners, if still living, are likely to be unaware of their bonds

whose proceeds are held by Treasury.  As a result, vast numbers of bonds are lost or forgotten

and go unredeemed, often for decades.

25.     The majority of these bonds are Series "E" bonds, which were first sold in 1941.

Nearly 4.6 billion Series E bonds were sold between 1941 and 1980.  Between 1941 and

November 30, 1965, Series E bonds were sold with 40-year terms.  Between December 1, 1965

and 1980, they carried 30-year terms.  The last Series E bond was sold in 1980, and the first such

bonds matured and ceased earning interest in 1981.  *All* Series E bonds have reached final

maturity and ceased earning interest, the last of them doing so in 2010.  Yet according to

information published on Treasury's website, matured and unredeemed Series E bonds currently have a combined value of more than $9.8 billion.

26.     For each bond sold by Treasury, the Bureau of the Public Debt (now consolidated along with the Financial Management Service into a new bureau, the Bureau of the Fiscal Service, or "Bureau") issues and maintains a registration record reflecting the last known addresses of registered owners.  Treasury's regulations also require the Bureau, on each sale of a bond, to register the bond with a record identifying the owner of the bond and the address of that person or entity at the time of sale.  *See* 31 C.F.R. §§ 315.5, 353.5.[1]

27.     Treasury's process for registering bonds has been heavily criticized.  Treasury initially created registration records for Series E bonds on paper.  These records were later converted to microfilm, and then later again were digitized in part, but these digitized records were not indexed nor made searchable.

28.     Despite extremely high levels of non-redemption, Treasury currently does not take affirmative steps to notify owners when bonds mature, not even by utilizing the addresses in its records.  Nor does Treasury publish any other form of notice to owners or undertake any effort to locate missing owners.  Moreover, even if Treasury wished to make efforts to repay its debts, Treasury is ill-equipped to do so.  By its own admission, Treasury's records are so vast and its recordkeeping so poor that it simply does not have the time or capacity to notify owners of the money owed to them.  A 1989 GAO report explained that "the Bureau of Public Debt does not have social security numbers or current addresses for owners of currently maturing U.S. savings bonds that were issued 30 to 50 years ago" and that "[a]gency initiatives to locate owners

---

[1] Citations herein to Treasury's regulations refer to those regulations as codified in the Code of Federal Regulations prior to Treasury's promulgation of the Final Rules.

would be very time-consuming and expensive."[2]  It is thus common for bonds to reach maturity without Treasury having contacted the owner even once in 30 or 40 years, especially for bonds that pay no periodic interest.

29.     Combined with the lengthy maturation periods of bonds and relatively small face amounts, this practice has resulted in many individuals misplacing, forgetting about, or otherwise abandoning their bonds.  Owners of bonds may live their entire lives having forgotten or misunderstood that they had rights to one or more bonds and the proceeds thereof (and, in fact, in many cases bonds pass by gift or inheritance to persons other than the purchaser, and those owners may never even become aware of their rights to bond proceeds).

30.     As a result, more than 50 million matured, unredeemed bonds worth approximately $17 billion remain outstanding nationwide, with the proceeds of this bond debt, as well as all ownership information concerning this debt, being held solely and exclusively by Treasury.

### Treasury's Redemption Process

31.     Redemption of bonds, like most aspects of bond ownership, is governed by Treasury's regulations.  Under 31 C.F.R. § 315.35 (and analogous provisions elsewhere in Chapter 31), "[p]ayment of a savings bond will be made to the person or persons entitled under the provisions of these regulations" — typically, the owner of the bond.

32.     One method of payment is surrender of the physical bond.  *See* 31 C.F.R. § 315.39(a).  But in the case of a bond that is lost, stolen, destroyed, mutilated, or defaced, the regulations authorize payment to any "person or persons . . . authorized under these regulations

---

[2] U.S. Gov't Accountability Office, GAO-AFMD-89-44, *Unclaimed Money:  Proposals for Transferring Unclaimed Funds to States*, at 4 (May 1989), *available at* http://www.gao.gov/assets/150/147740.pdf.

to request payment of the bonds," including the rightful owner or his or her representative, as long as the applicant can provide the requisite information to Treasury, such as the bond's serial number or other identifying information.  *See id*. §§ 315.25, 315.26(a)-(b).

33.     When Treasury pays a bond for which the physical certificate is not redeemed, the regulations authorize Treasury to protect itself against a duplicate claim should the lost bond turn up by "requir[ing] a bond of indemnity, in the form, and with the surety, or security, [the Secretary] considers necessary to protect the interests of the United States."  *Id*. § 315.25.

34.     Pursuant to 31 C.F.R. §§ 315.20, 353.20, Treasury will recognize a claim of "interest in" bonds where such ownership interest was established by "valid, judicial proceedings."  Treasury's regulations further provide that proceeds of bonds will be paid to a "person or persons entitled under the provisions of these regulations . . .  without regard to any notice of adverse claims to a bond" under 31 C.F.R. §§ 315.35, 353.35.  Under the relevant Treasury regulations operative before Treasury promulgated the Final Rules, such "valid, judicial proceedings" could include those provided for in title-based state escheat laws.

**Treasury's Historical Position on State Escheat Claims**

35.     Before Treasury promulgated the Final Rules, it was Treasury's longstanding position — for more than 60 years — that one valid marker of ownership in a bond was a State's valid title to the bond obtained through the law of escheat.

36.     In 1952, the Bureau of the Public Debt promulgated Public Bulletin No. 111 setting out Treasury's position with respect to "State statutes purporting to vest abandoned property, including United States securities, in certain State officers."  Bulletin No. 111, which contains an extensive legal analysis to support Treasury's interpretation of its regulations relating to this subject, includes the following statement:

the Department will pay one who *succeeds to the title* of the bondholder.  This is not regarded as a violation of the agreement, but, on the contrary, as payment to the bondholder in the person of his successor or representative.  Thus, although the regulations do not mention such a case, the Department recognizes the title of the state when it makes claim based upon a judgment of escheat.

37.     In 1983, the Treasury's Director of Transactions and Rulings stated as follows in

a letter to the Kentucky Secretary of Revenue regarding a request by that State for payment of

abandoned bonds:

> The Treasury has considered at length on several occasions the matter of whether a State could be recognized as entitled to the proceeds of United States securities where the claim thereto is based on abandonment.  Basically, the Department's position is that claims by States for payment of United States securities will be recognized only where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings.  The Department does not recognize claims for payment by a State acting merely as a custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.  … In other words, the Treasury recognizes escheat statutes that provide that a State has succeeded to the legal ownership of securities because in such case payment of the securities results in full discharge of the Treasury's obligation and this discharge is valid in all jurisdictions.  Payment of securities to a State claiming only as a custodian results in the substitution of the State for the Department of the Treasury as obligor on the securities.  …

38.     In 2000, Treasury published the following statement (hereinafter, the "Escheat

Decision") on its website, on a webpage entitled "EE/E Savings Bonds FAQs"[3]:

> The Department of the Treasury will recognize claims by States for payment of United States securities where the States have succeeded to the title and ownership of the securities pursuant to valid escheat proceedings.  The Department, however, does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.
>
> In other words, the Treasury recognizes escheat statutes that provide that a State has succeeded to the legal ownership of securities <u>because in such case</u>

---

[3] *See EE/E Savings Bonds FAQs*, TreasuryDirect.gov, *available at* https://web.archive.org/web/20150503150349/https://www.treasurydirect.gov/indiv/research/ind epth/ebonds/res_e_bonds_eefaq.htm#escheatment (archive of webpage as of May 2015) (emphasis added).

<u>payment of the securities results in full discharge of the Treasury's obligation and
this discharge is valid in all jurisdictions.</u>

But, payment of securities to a State claiming only as a custodian results in
the substitution of one obligor, the Department of the Treasury, for another, the
State. Not only is there serious question whether there is authority for a State to
effect such a substitution, but also there seems to be no basis for believing that
payment to a State custodian would discharge Treasury of its obligation. Even if
the discharge were claimed effective in the State to which the payment is made, it
is believed that the Treasury's obligation and liability would still remain in force
in all other jurisdictions.

39.     In 2004, Treasury sent a series of letters to various states in response to those

states' custody-based redemption claims.  In those letters, Treasury reaffirmed that, in order for

bonds to be paid to a state pursuant to Treasury's regulations governing payment to registered

owners, the state must have the "statutory authority to obtain title to the individual bonds" and

"an order of escheat from a court of competent jurisdiction vesting title in the state to the

individual bonds."[4]  Those letters also reiterated Treasury's position that owners of bonds need

not present the physical bond for redemption, and are permitted to "file a claim for lost bonds."

40.     Thereafter, in 2006, Treasury's Assistant Commissioner, Office of Investor

Services, stated as follows in a letter to Florida's legal counsel to the State's Chief Financial

Officer regarding a request by that State for payment of abandoned bonds:

The applicable regulations would permit the state of Florida to be paid for bonds,
pursuant to an appropriate state statute and after due process, by obtaining an
order of escheat from a court of competent jurisdiction vesting title in the state,
and then applying for payment to the Department of the Treasury pursuant to the
procedures established by the regulations that all bond owners must utilize.  The
Treasury Department has no authority to pay Florida (or anyone else) the
proceeds of matured but unredeemed savings bonds owned by the residents of
Florida outside the context of these procedures.

---

[4] Although these letters also noted in passing that states must have possession of the bonds for
which they seek payment, it was the states' lack of title to the claimed bonds — and not their
lack of possession — which formed the basis for Treasury's denial of those claims.

Notably, the 2006 letter to the State of Florida does not explicitly provide that possession is required if a State seeks to redeem a bond.  Instead, that letter states that if Florida invokes a proper title escheatment process, it can be paid for the bonds under "[t]he applicable regulations."

41.     Treasury's Escheat Decision, excerpted above, expressly rejected any right of the states to redeem unclaimed bonds over which they only have *custody*.  But the Decision made clear that Treasury will honor *title-based* unclaimed property laws.  Under the authority of the Escheat Decision, Treasury consistently rejected written requests to Treasury to deliver matured, unredeemed bonds into state custody in accordance with *custody-based* unclaimed property laws. When it did so, Treasury relied on the longstanding distinction it had drawn between custody-based and title-based escheat.  *E.g.*, *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 390-91 (2012).

42.     Treasury removed the Escheat Decision from its website sometime in 2015, before the Final Rules were adopted.

43.     The United States has described the Escheat Decision as "[Treasury]'s interpretation of federal savings bond regulations," and has noted that the Escheat Decision "reflects [Treasury]'s understanding of existing laws, and that the Department ha[d] no intention of deviating from the statement."  *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d at 391 (internal quotation marks omitted).  As the Solicitor General of the United States acknowledged in the Supreme Court of the United States, "the Escheat Decision represent[ed] the [Treasury] Department's considered interpretation of federal law."  Brief for Resp'ts in Opp'n at 4, *Dir. of the Dep't of Revenue of Mont. v. Dep't of the Treasury*, No. 12-926, 133 S. Ct. 2735, 2013 WL 1803570, at *4 (2013).

44.     In addition, the Court of Federal Claims has ruled that Treasury's prior regulations required Treasury to recognize redemption claims brought by states that escheat valid title to matured bonds. *See Estes*, 123 Fed. Cl. 74. Prior to the CFC's decision in *Estes* but after briefing and argument on Treasury's unsuccessful motion to dismiss in that court, Treasury took the Escheat Decision offline.

**State Escheat Laws**

45.     Every State in the U.S. and the District of Columbia operates an "unclaimed property" program designed to reunite lost and abandoned property with owners. Annually, these programs combine to return more than one billion dollars' worth of property that, but for these programs, would almost certainly remain lost. These programs apply both to tangible property (*e.g.*, collectibles or art) and intangible property (*e.g.*, savings bonds or stock certificates).

46.     State unclaimed property laws rely on the ancient sovereign power of escheat. Historically, States' unclaimed property acts have provided for custody-based escheat. Once property is considered abandoned or unclaimed under state law, *custody* of the property, but not title, passes to the State for safekeeping and administration. Once the State has custody, it can leverage its unclaimed property program to attempt to unite lost property with its owner.

47.     However, several states (17 and counting) have adopted *title*-based escheat laws with respect to bonds. These state laws, passed in reliance upon Treasury's Escheat Decision and Treasury's repeated citation of its authoritative nature, authorize the State to escheat title to — that is, valid legal ownership of — matured, unclaimed bonds following required state proceedings and due process, and then to leverage the State's unclaimed property programs to allow a claims process for returning the bond proceeds to the bonds' original owners.

48.     These laws further authorize state treasurers to redeem the bonds that escheat to the State and take title to the matured proceeds.

49.     Generally, these laws provide that unredeemed bonds escheat to the State under the following process:

a. Bonds are "presumed abandoned" property if unclaimed and unredeemed by the apparent owner for a specified number years — typically, between 3 and 5 years — after the bond's maturity date.

b. Three years after the bonds become abandoned property (e.g., 6 to 8 years after the maturity date, depending on the operative abandonment period under the relevant state statute), unclaimed bonds are capable of escheating to the State, such that all property rights, including title to the bonds or proceeds from such bonds, vest solely in that State.

c. The State Treasurer must commence an action in state court for a judicial determination that the bonds have escheated to the State.

d. The State Treasurer must make service by publication of the state escheat proceedings and file an affidavit outlining the due diligence efforts taken to locate and notify bond owners.  In practice, State Treasurers also provide notice above and beyond that required by statute and seek to cover their entire geographical area.

e. If no one claims entitlement to the bonds, or if the state court determines that a claimant is not entitled to the bonds, the state court will enter judgment that the bonds have escheated to the State.

f. The State Treasurer will then redeem any bonds that escheated to the State and deposit the proceeds of the bonds into a state fund.

14

50.     Kansas is one such state to have adopted a title-based escheat law with respect to bonds.  In March 2013, Kansas escheated title to certain matured, unredeemed bonds pursuant to a state judgment of escheatment.

51.     In May 2013, Kansas Treasurer Ron Estes filed a claim with Treasury for redemption of those bonds.  In November 2013, Treasury recognized Kansas's title ownership rights and redeemed more than 1,400 bonds that were in the State Treasurer's physical custody. However, as to Kansas's much larger bond claim, Treasury refused to redeem those bonds titled to Kansas that were not in the Treasurer's possession, asserting that Treasury's regulations permit state escheatment claims only when the State possesses the bonds in its claim.

52.     In December 2013, Treasurer Estes filed suit in the Court of Federal Claims, alleging that Treasury had unlawfully denied Kansas's requests to redeem the matured, unredeemed bonds to which Kansas held sole and valid title pursuant to a state escheat judgment, but which had been lost, stolen, abandoned, or destroyed, and were not in Kansas's possession. *See* Compl., *Estes v. United States*, No. 13-cv-1011, ECF No. 1 (Fed. Cl. filed Dec. 20, 2013). Treasury moved to dismiss the complaint in *Estes*, and — as noted above — took the Escheat Decision off of its website while that motion was pending.

### The Proposed Rules and Public Comments

53.     On July 1, 2015 — days after filing a brief supporting its motion to dismiss in *Estes* — Treasury published in the Federal Register a Notice of Proposed Rulemaking ("NPRM"), in which it proposed to amend its regulations governing bonds "to explicitly address state escheat claims to unclaimed savings bonds."  Regulations Governing United States Savings Bonds, 80 Fed. Reg. 37,559, 37,560 (July 1, 2015).

54.     The NPRM reclassified Treasury's prior recognition of Kansas's claim of title to escheated bonds in the State's possession as an exercise of Treasury's "waiver authority under 31 CFR 315.90," even though Treasury had made no contemporaneous mention of such a waiver in redeeming those bonds.  *Id*.

55.     The NPRM also erroneously stated that its existing regulations did not "require Treasury to recognize a state escheat judgment for unclaimed property."  *Id*.

56.     The NPRM proposed to amend Treasury's bond regulations, assertedly "to address issues that arise from state escheat claims."  *Id*.  First, Treasury proposed to amend its regulations to "explicitly provide that escheat proceedings will not be recognized" as valid, judicial proceedings capable of establishing interest in a bond.  *Id*. at 37,560, 37,561-62.  Second, Treasury proposed to amend its regulations to "establish[] a new procedure for states to submit escheat claims under their unclaimed property statutes for Treasury's consideration."  *Id*. at 37,560.  This new procedure would "provide Treasury with discretion to recognize an escheat judgment that purports to vest a state with title to a definitive savings bond that has reached the final extended maturity date and is in the state's possession," but would also require States requesting such recognition to satisfy certain "Due Process" requirements.  *Id*. at 37,560, 37,561-62.

57.     Numerous state finance officials responsible for the administration of state unclaimed property programs (including Plaintiffs), as well as various national associations whose membership is comprised of such officials, submitted comments to Treasury objecting to the NPRM.

58.     Among other things, commenters protested that the NPRM represented an unfounded and sharp departure from Treasury's longstanding prior policy of acknowledging the

State's authority to escheat title to, and redeem, bonds.  *See, e.g.*, Comments of Treasurers and Other Related Officials of the States of Kansas, Louisiana, South Dakota, Pennsylvania, Mississippi, Kentucky, North Dakota, Iowa, South Carolina, and Maine at 13-14 (Aug. 17, 2015) ("State Treasurer Comments"); National Association of Unclaimed Property Administrators ("NAUPA") Comment Letter at 1-2 (Aug. 7, 2015); National Association of State Treasurers ("NAST")  Letter at 1-2 (Aug. 17, 2015).  Commenters further criticized Treasury for undertaking this significant change in position without properly acknowledging that the NPRM represented a "major policy shift."  *See id.*

59.     Commenters also catalogued the detrimental impact the NPRM would have on the States' ability to return the proceeds of abandoned and unclaimed bonds to bond owners using state unclaimed property programs.  The commenters noted that the States, which return billions of dollars to rightful owners pursuant to these programs, "are far better positioned than Treasury to unite the proceeds of long-matured savings bonds with their rightful original owners" than Treasury, which takes no steps to connect holders of matured bonds to the proceeds to which they are entitled.  State Treasurer Comments at 19-22; *see also* NAST Letter at 1 (Aug. 17, 2015).

**The Final Rules**

60.     On December 24, 2015, Treasury promulgated the Final Rules, which took effect on the same day.  80 Fed. Reg. at 80,258.

61.     The Final Rules altered Treasury's regulations governing escheat-based redemption claims by adopting new rules providing that Treasury will no longer "recognize an escheat judgment that purports to vest a State with title to a bond that the State does not possess." *Id.* at 80,264.

62.    Though granting itself largely unfettered discretion to recognize state escheat claims under its waiver authority, Treasury altered its regulations such that Treasury is no longer "bound by" state escheat proceedings.  *Id*. at 80,263.  The Final Rules state that Treasury "may, in its discretion," recognize escheat judgments that vest a State with title to savings bonds in the State's possession "when the State presents evidence satisfactory to Treasury that the bond has been abandoned by all persons entitled to payment under Treasury regulations."  *Id*. at 80,264-65 (to be codified at 31 C.F.R. §§ 315.88, 353.88 & 360.77).  These regulations require States seeking such recognition to satisfy certain "[d]ue process" requirements by, "[a]t a minimum," "demonstrat[ing] to Treasury's satisfaction that it made reasonable efforts to provide actual and constructive notice of the escheat proceeding to . . . all persons who may have an interest in the bond, and that those persons had an opportunity to be heard before the escheat judgment was entered."  *Id*.

63.    The Final Rules also amend Treasury's existing regulations to specify that "[e]scheat proceedings will not be recognized" as valid, judicial proceedings sufficient to establish a claim of ownership of or interest in a bond.  *Id*. (to be codified at 31 C.F.R. §§ 315.20, 353.20 & 360.20).  However, the Final Rules also impose the new (and unlawful) requirement that "Treasury may require any other evidence to establish the validity of judicial proceedings, such as evidence that the proceedings provided due process, complied with [applicable Treasury regulations], and complied with relevant state law."  *Id*.

64.    In its rule release, Treasury does not acknowledge that the Final Rules represent a major shift in its long-standing policies concerning state escheat claims — much less provide a reasoned explanation for abandoning them.  Instead, Treasury frames the Final Rules as "clarif[ications]" of "its prior statements on escheat," designed to "describe more formally the criteria

Treasury will use to evaluate escheat claims" and to remove "any ambiguit[ies]" in its prior regulations. *Id*. at 80,259, 80,262. Treasury insists that its Final Rules "do[] not conflict" with its past statements and actions concerning escheatment. *Id*. at 80,262. Treasury asserts that its prior statements were not relevant to the Final Rules because they did not "address[] claims by states to the title of savings bonds that are still in the registered owner's possession," and did not concern "the full criteria that Treasury would apply under a title escheat statute when a state seeks to redeem savings bonds that it does not possess." *Id*. at 80,261. Treasury also re-characterizes its past recognition of state claims to title of matured, unredeemed bonds as an exercise of Treasury's discretionary waiver authority. *See id*.

65. As justification for its Rules, Treasury asserts that the Final Rules will "protect the rights of savings bond owners." *Id*. at 80,260. In support of this contention, Treasury suggests — citing to a series of letters sent to various states by Treasury between 2004 and 2006 in response to those states' redemption claims — that most matured, unredeemed bonds are not lost, but are instead being intentionally held by registered owners. In those letters, Treasury stated that — as part of a highly limited, self-serving, and now-defunct outreach effort — it had "located some 25,000 owners of matured bonds to advise them that their bonds had stopped earning interest and to encourage them to redeem the bonds," and that 70% of those bond owners contacted "had the bonds in question in their possession and knew they had stopped earning interest but chose not to redeem them." Yet, those same letters also show that significant minorities of the bond owners Treasury contacted either did not know they had a bond (10%) or did not know their bonds had matured (20%). Moreover, these figures highlight that Treasury's broadest outreach efforts have consisted of an attempt to contact 25,000 out of 50 million bond owners — or 0.05%. Treasury ceased its outreach programs in 2011.

19

## CLAIMS FOR RELIEF

## COUNT I

## (Arbitrary and Capricious Agency Action)

66.     Plaintiffs incorporate by reference the allegations in paragraphs 1-65 as though fully set forth herein.

67.     Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be" (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and (4) "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).  Agency action is arbitrary and capricious if an agency changes position but does not "display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

68.     Treasury's position on escheatment has been clear since the 1952 Escheat Decision, and, since then, it has been repeated, reaffirmed, and judicially confirmed.  Indeed, in denying Treasury's motion to dismiss in *Estes*, the Court of Federal Claims rejected the very same positions Treasury now sets forth in its Final Rules.

69.     In adopting the Final Rules, Treasury sharply departed from this policy without acknowledging its reasons for departing from prior policy or explaining why that policy no longer holds.  In so doing, Treasury acted in a manner that was arbitrary, capricious, and otherwise not in accordance with the law.

70.     Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A)-(D).

## COUNT II

### (Arbitrary and Capricious Agency Action)

71.     Plaintiffs incorporate by reference the allegations in paragraphs 1-70 as though fully set forth herein.

72.     The Administrative Procedure Act requires an agency promulgating a rule to "articulate a satisfactory explanation for its action," *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and to articulate a "rational connection between the facts found and the choice made," *id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  In adopting the Final Rules' limitations on state escheat claims, Treasury failed to satisfy its responsibilities under the Administrative Procedure Act to articulate a rational connection between the facts it found and the decisions it made.

73.     Treasury did not articulate a rational explanation for its determination that most matured, unredeemed bonds are not lost or abandoned.  The very evidence Treasury cited in support of this conclusion shows that significant numbers of bond owners were unaware that they had matured bonds, and was also pulled from an extremely limited data set.

74.     Nor did Treasury provide a satisfactory explanation for its decision to make it harder for citizens to see proceeds of matured, unclaimed bonds with help from state unclaimed property programs.

75.     Thus, for Treasury to conclude that its new rules protect the rights of bondholders — in the face of convincing evidence that the States are far better positioned than Treasury to unite the proceeds of long-matured bonds with their rightful original owners — is clearly arbitrary and capricious.

76.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A)-(D).

## COUNT III

### (Violation of 28 U.S.C. § 1257 and the Administrative Procedure Act)

77.     Plaintiffs incorporate by reference the allegations in paragraphs 1-76 as though fully set forth herein.

78.     The Final Rules subject the recognition of State escheat judgments to Treasury's "discretion," providing that Treasury will recognize these judgments only when (1) "the State presents evidence satisfactory to Treasury that the bond has been abandoned" and (2) the State satisfies certain "[d]ue process" requirements by "demonstrat[ing] to Treasury's satisfaction that it made reasonable efforts to provide actual and constructive notice of the escheat proceeding to" all potentially interested persons and that such persons were provided "an opportunity to be heard before the escheat judgment was entered."  80 Fed. Reg. at 80,263, 80,264.

79.     In reviewing these proper state-court judgments, Treasury has arrogated to itself review of final, state-court judgments properly made only by the Supreme Court.  *See Lance v. Dennis*, 546 U.S. 459, 463 (2006) (citing 28 U.S.C. § 1257) (holding that the Supreme Court has "exclusive . . . jurisdiction over appeals from final state-court judgments").  The Final Rules are thus unlawful because Congress has not authorized Treasury to review the escheatment inquiry undertaken by the state court.

80.     To the extent Treasury intends for its review to assess the state court's compliance with the Constitution's Due Process clause, the Final Rules also runs afoul of the principle that courts hesitate to presume that Congress intended to grant administrative agencies review authority over "significant constitutional questions."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).  The Final Rules are thus further unlawful because, by undertaking this Due Process review, Treasury has exceeded its statutory authority.

81.    Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A)-(C).

## COUNT IV

### (Violation of the Tenth Amendment and the Administrative Procedure Act)

82.    Plaintiffs incorporate by reference the allegations in paragraphs 1-81 as though fully set forth herein.

83.    The Final Rule creates a second, less favored tier of ownership for States, subjecting their redemption claims to additional obstacles and an extra layer of review.  Treasury does not propose to alter the general rule that "[p]ayment of a savings bond will be made to the person or persons entitled under the provisions of these regulations" — generally the owner of the bond.

84.    Nor does Treasury propose to overrule the Escheat Decision, which recognized that a State that escheats title to a bond "succeeds to the title of the bondholder" and that payment to that State is treated "as payment to the bondholder in the person of his successor or representative."  Nor, again, does Treasury propose to alter the regulation governing payment to a representative — a regulation that does not condition payment on Treasury's "discretion" or the representative's possession of the bond.

85.    Treasury simply proposes to make it harder for one group of owners — States — to obtain title to abandoned bonds and then to redeem those bonds to which they hold valid title.  This demotion would harm the "integrity, dignity, and residual sovereignty of the States" that our Federal system of government protects.  *Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 2623 (2013) (quoting *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011)).

86.    And because Treasury has exceeded its statutory authority in promulgating these Final Rules, the "procedural safeguards inherent in the structure of the federal system" have proved

insufficient to protect "State sovereign interests." *Garcia v. San Antonio Metro. Transit Auth.*, 469

U.S. 528, 551 (1985).  The Final Rules thus violate the Tenth Amendment.

87.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A)-(C).

## COUNT V

### (Violation of the Fourteenth Amendment; Article VIII, Section 8, Clause 2 of the United States Constitution; and the Administrative Procedure Act)

88.     Plaintiffs incorporate by reference the allegations in paragraphs 1-87 as though

fully set forth herein.

89.     Article VIII, Section 8, Clause 2 of the Constitution empowers the federal

government to "borrow money on the credit of the United States."  Under this grant of power,

Congress has authorized Treasury to issue savings bonds and to set the terms and conditions that

govern the savings bond program.  *See* 31 U.S.C. § 3105.  Treasury's bond regulations

implement this authority and constitute the terms of express bond contracts between the bond

owner and the United States.

90.     With respect to bonds that were issued and matured before Treasury promulgated

the Final Rules, these bond contracts — as set forth in Treasury's regulations and pursuant to its

long-standing position on state escheatment — contemplated that bond ownership would be

subject to the States' sovereign power of title escheatment, and thus that any unclaimed bond

proceeds could be returned to states, rather than retained in perpetuity by Treasury.  As such,

purchasers of such bonds were assured that, should their matured bonds become lost or

abandoned, the State could escheat title to those bonds and then leverage the State's successful

unclaimed property program to return the proceeds to those purchasers or their heirs.

91.     By making it difficult — and in some cases impossible — for States to play this

critical role in the bond redemption process, the Final Rules fundamentally alter the terms of

these bond contracts.  As an initial matter, the Final Rules abrogate the bond contracts between Treasury and states that have already escheated title to matured, unclaimed bonds before Treasury promulgated the Final Rules by purporting to impose limitations on the State-as-bond-owner's right to redemption through retroactive rules.

92.     More generally, the Final Rules abrogate the bond contracts between Treasury and all purchasers of bonds issued before Treasury promulgated the Final Rules by repudiating the background understanding contained in all such contracts that the States — acting on behalf of their citizens — would be able to return the proceeds of lost or unclaimed bonds to their rightful owners.

93.     The Supreme Court has long held that the government, having "the power to borrow money on the credit of the United States, . . . has not been vested with authority to alter or destroy" its contractual obligations created by bonds issued pursuant to that power.  *Perry v. United States*, 294 U.S. 330, 353 (1935).  As such, any attempt by the government to override its obligations created by such bonds goes "beyond the congressional power [to borrow money]" and runs afoul of the Fourteenth Amendment, which "explicitly declares" that "[t]he validity of the public debt . . . shall not be questioned."  *Id*. at 354.  Moreover, Congress did not grant Treasury the authority to promulgate retroactive rules that alter either bond ownership or the terms of the bond contract.  *See generally Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988).

94.     The Final Rules thus violate Article VIII, Section 8, Clause 2 of the Constitution, as well as the Fourteenth Amendment, by repudiating Treasury's obligations pursuant to its contracts with (1) state bond owners and (2) the owners of all bonds issued and fully matured before Treasury promulgated the Final Rules.  The Final Rules also violate 5 U.S.C. § 706(2)(C)

by purporting to divest States, retroactively, of ownership rights they had obtained through valid state-court escheat judgments.

95.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A)-(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and:

1.      Vacate and set aside the Final Rules;

2.      Declare that Defendants violated the Administrative Procedure Act in issuing the Final Rules;

3.      Declare that the Final Rules are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

4.      Enjoin and restrain Defendants, their agents, employees, successors, and all persons acting in concert or participating with Defendants from enforcing or applying (or requiring others to enforce or apply) the Final Rules;

5.      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

6.      Grant Plaintiffs any other relief as may be necessary and appropriate or as the Court deems just and proper.

Date: March 8, 2016

Respectfully Submitted,

By /s/ David C. Frederick
    David C. Frederick (#431864)
    *Attorney of Record*
    Scott H. Angstreich
    Benjamin S. Softness
    Katherine C. Cooper
    KELLOGG, HUBER, HANSEN, TODD,
     EVANS & FIGEL, P.L.L.C.
    1615 M Street N.W., Suite 400
    Washington, D.C. 20036
    (202) 326-7900 (Telephone)
    (202) 326-7999 (Facsimile)
    dfrederick@khhte.com

and

    J. Brett Milbourn
    WALTERS BENDER STROHBEHN
    & VAUGHAN, P.C.
    2500 City Center Square
    1100 Main Street
    P.O. Box 26188
    Kansas City, Missouri  64196
    (816) 421-6620 (Telephone)
    (816) 421-4747 (Facsimile)
    bmilbourn@wbsvlaw.com

ATTORNEYS FOR PLAINTIFFS