## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RON ESTES**, **Treasurer of the State of Kansas, et al.**,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　　　　v.<br><br>**U.S. DEPARTMENT OF THE TREASURY**, **et al.**,<br>　　　　　　　　Defendants. | Case No. 1:16-cv-00450 (CRC) |

### *Table of Contents*

I.　　**Background** ..................................................................................................... 3

　A.　United States Savings Bond Program ........................................................ 3

　B.　State Attempts to Redeem Bonds by Escheat ............................................ 4

　C.　Kansas's Title-Escheatment Statute and Redemption Efforts ......................... 7

　D.　The Rulemaking ..................................................................................... 10

　E.　Procedural History .................................................................................. 11

II.　**Legal Standards** .......................................................................................... 11

III.　**Analysis** .................................................................................................... 12

　A.　Whether the Rule Constitutes an Unacknowledged Policy Change ............. 12

　　1.　*Whether the Possession Requirement is a Policy Change* ..................... 13

　　2.　*Whether the Discretionary Aspect of the Rule is a Policy Change* ........... 17

　　3.　*Whether Other Apparent Inconsistencies Invalidate the Rule* ................ 18

　B.　Whether the Rule is Otherwise Arbitrary and Capricious .......................... 22

　　1.　*Whether Treasury Adequately Weighed Evidence of State Unclaimed Property Programs* ................................................................................. 23

　　2.　*Whether the Rule is Based on an Erroneous Interpretation of Property Law* ............... 25

　　3.　*Whether the Rule Arbitrarily Discriminates Against State Owners* .............. 27

　C.　Whether the Rule Was Promulgated in Violation of the Appointments Clause ........... 28

　　1.　*Whether Plaintiffs Waived Their Appointments Clause Challenge* .............. 28

　　2.　*Whether the Fiscal Assistant Secretary is a De Facto Principal Officer* ......... 29

　D.　Whether the Rule Authorizes the Improper Review of State Judgments .................. 32

　E.　Whether the Rule Violates the Tenth Amendment ........................................ 34

IV.　**Conclusion** ................................................................................................ 36

**MEMORANDUM OPINION**

In the throes of the Great Depression, President Franklin D. Roosevelt and Treasury Secretary Henry Morgenthau, Jr., set out to create a public debt program that would both stimulate the nation's faltering economy and renew the confidence of average American investors badly shaken by the collapse of the private banking system. United States Department of Treasury, A History of the United States Savings Bonds Program 4–5 (1991). What they devised would later help finance World War II and the country's post-war expansion, and ultimately become the world's widest-held security: the United States savings bond. Id. Backed by the full faith and credit of the federal government, savings bonds are one of the safest investments available: They can be redeemed upon presentation by the registered owner, with an almost-guaranteed assurance of full payment, at any time after they mature. But what happens when a state takes title to a bond that it deems to have been abandoned by the owner? May it redeem the bond and keep the proceeds? That is the question underlying this case.

Plaintiff Ron Estes, Treasurer of the State of Kansas, and four fellow state treasurers, challenge a rule promulgated by the United States Department of the Treasury ("Treasury") governing the circumstances under which Treasury will honor payment requests from states for U.S. savings bonds they purport to own through their own escheatment statutes. See Regulations Governing United States Savings Bonds ("Rule"), 80 Fed. Reg. 80,258 (Dec. 24, 2015). Plaintiffs contend the Rule violates the Administrative Procedure Act ("APA") because it capriciously abandons prior Treasury policy, arbitrarily avoids considering key evidence, and rests on an erroneous understanding of property law. They also claim the Rule violates various constitutional and jurisdictional principles.

2

Plaintiffs have fairly pointed out inconsistencies between certain of the Rule's rationales and certain of Treasury's prior informal statements.  But they cannot show what they must—that Treasury departed from a clear policy without adequate explanation.  Plaintiffs' other challenges also fail, for the reasons elaborated below.  The Court will, accordingly, uphold the Rule and grant summary judgment for Treasury.

## I.   Background

### A.   United States Savings Bond Program

Under the Constitution, the federal government has the enumerated power "[t]o borrow Money on the credit of the United States."  U.S. Const. art. I, § 8, cl. 2.  "Pursuant to this grant of power, the Congress authorized the Secretary of the Treasury, with the approval of the President, to issue savings bonds in such form and under such conditions as he may from time to time prescribe[.]"  Free v. Bland, 369 U.S. 663, 667 (1962) (citing the predecessor to 31 U.S.C. § 3105).  In particular, Congress authorized the Secretary, among other things, to define "the conditions, including restrictions on transfer, to which [savings bonds] will be subject," and to set the "conditions governing their redemption."  31 U.S.C. § 3105(c)(3), (4).  These regulations provide that "[r]egistration is conclusive of ownership," 31 C.F.R. § 315.5(a), and as permitted by statute, they do not fix any time limits for the redemption of savings bonds after maturity.  See 31 U.S.C. § 3105(b)(2) ("The Secretary may prescribe regulations providing that . . . owners of savings bonds may keep the bonds after maturity.").

The general rule that registration determines ownership is subject to some exceptions, including that Treasury will recognize some—but not recognize other—"judicial determination[s] on adverse claims affecting savings bonds."  31 C.F.R. § 315.20.  For example, Treasury *has* "recognize[d] a claim against an owner of a savings bond . . . if established by

valid, judicial proceedings," such as a claim by a trustee in accordance with bankruptcy proceedings.  Id. §§ 315.20(b), 315.21.  On the other hand, Treasury has for some time refused to "recognize a judicial determination that gives effect to an attempted voluntary transfer inter vivos of a bond, or a judicial determination that impairs the rights of survivorship conferred by the[] regulations upon a co[-]owner or beneficiary."  Id. § 315.20(a).

B.  State Attempts to Redeem Bonds by Escheat

The Rule adds to these regulations.  It addresses the circumstances under which Treasury will permit states to redeem savings bond proceeds in accordance with state escheatment laws. Escheat is "a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears."  Texas v. New Jersey, 379 U.S. 674, 675 (1965).  Prior to the challenged rulemaking, Treasury's regulations did not specifically address the validity of state escheat proceedings as they related to bond ownership.  The Department did, however, address that subject through informal policy guidance.

In 1952, for example, Treasury issued a bulletin which incorporated a letter from the Secretary of the Treasury to the New York State Comptroller regarding whether the state might "receive payment of certain United States securities of which it is not the registered owner." A.R. 1.  The bonds were in the possession of the state, and registered in the name of an individual who had passed away at a state mental institution without heirs.  Id.  Under these circumstances, where the state did not have title to the bonds in question, the Secretary declined the Comptroller's request for payment.  The Secretary noted, however, that "the Department [would] pay one who succeeds to the title of the bondholder," since such payment would be regarded as "to the bondholder in the person of his successor or representative."  A.R. 3.

Although not specified by regulation, the Secretary explained that "the Department recognizes the title of the state when it makes claim based upon a judgment of escheat." Id.

Three decades later, Treasury repeated the same position in a letter to the Kentucky Secretary of Revenue under similar circumstances—i.e., regarding abandoned bonds in the state's possession. A.R. 5 (September 1983 Treasury Letter). "[C]laims by States for payment of United States securities," the Department wrote, "will be recognized only where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings. The Department does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities." Id. And beginning in 2000, Treasury included the following exchange on the Department's Q&A webpage: In response to a question regarding whether a state can "claim the money represented by securities that a state has in its possession[, such as] savings bonds that it's gotten from abandoned safe deposit boxes," Treasury stated that it would recognize such claims for payment "where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings." A.R. 781.[1]

---

[1] The full text of the Q&A reads as follows:

"[Q:] In a state that has a permanent escheatment law, can the state claim the money represented by securities that the state has in its possession. For example, can a state cash savings bonds that it's gotten from abandoned safe deposit boxes?

"[A:] The Department of the Treasury will recognize claims by States for payment of United States securities where the States have actually succeeded to the title and ownership of the securities pursuant to valid escheat proceedings. The Department, however, does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.

"In other words, the Treasury recognizes escheat statutes that provide that a State has succeeded to the legal ownership of securities because in such case payment of the securities results in full discharge of the Treasury's obligation and this discharge is valid in all jurisdictions.

"On the other hand, payment of securities to a State claiming only as a custodian results in the substitution of one obligor, the Department of the Treasury, for another, the State. Not

Then, around 2000, the ground began to shift.  For the first time, states sought to redeem

bonds—escheated in accordance with newly-passed statutes—that were *not* in their possession.

In 2004 and 2006, for example, a number of states pressed so-called "custody" escheat claims for

matured, unredeemed bonds they did not possess but whose registered owners had last-known

addresses in the state.  Treasury denied the states' claims, on the grounds that "[i]n order for the

bonds to be paid . . . the commonwealth [or state] must have possession of the bonds, statutory

authority to obtain title to the individual bonds, obtain an order of escheat from a court of

competent jurisdiction vesting title in the state to the individual bonds, and apply to the

Department of Treasury for payment."  A.R. 106–07 (April 2004 Treasury Letter to Kentucky

Treasurer); see also A.R. 114–15 (April 2004 Treasury Letter to Illinois Treasurer) (same); A.R.

124–25 (April 2004 Treasury Letter to North Carolina Treasurer) (same); A.R. 118–19 (May

2004 Treasury Letter to New Hampshire Treasurer) (same); A.R. 102–03 (August 2004 Treasury

Letter to South Dakota Treasurer) (same); A.R. 110–11 (August 2004 Treasury Letter to

Connecticut Treasurer) (same); A.R. 126–27 (October 2006 Treasury Letter to Chief Counsel for

the Florida Chief Financial Officer) ("Payment on a bond may only be made to the owner of the

bond upon presentation and delivery of the bond.").

Treasury's position was challenged and upheld in court.  Treasurer of New Jersey v.

Dep't of the Treasury, 684 F.3d 382 (3d Cir. 2012).  The Third Circuit concluded "that the

federal statutes and regulations pertaining to United States savings bonds preempt the States'

unclaimed property acts insofar as the States seek to apply their acts to take custody of the

---

only is there serious question whether there is authority for a State to effect such a substitution,
but there seems to be no basis for believing that payment to a State custodian would effectively
discharge Treasury of its obligation.  Even if the discharge were claimed effective in the State to
which the payment is made, it is believed that the Treasury's obligation and liability would still
remain in force in all other jurisdictions."  A.R. 781.

proceeds of the matured but unredeemed savings bonds." Id. at 407.  In particular, the court

reasoned that the states' escheatment efforts—which "specif[ied] that matured bonds are

abandoned . . . if not redeemed within a time period as short as one year after maturity" and

which would have potentially complicated redemption procedures—conflicted with Congress's

and Treasury's "goal of making the bonds 'attractive to savers and investors.'" Id. at 407–09

(quoting Free, 369 U.S. at 669).

In a brief submitted to the Supreme Court in opposition to certiorari, Treasury—

represented by the Solicitor General—identified the failure to transfer actual title as an important

deficiency in the states' custody-escheatment statutes:  "[Treasury] has long advised the States

that to receive payment on a U.S. savings bond a State must complete an escheat proceeding that

satisfies due process and that awards title to the bond to the State, substituting the State for the

original bondholder as the lawful owner." A.R. 14.  Treasury's position, however, was also

grounded in the broader purposive considerations outlined by the Third Circuit.  The Department

emphasized that the new escheat statutes "would undermine the central purpose of the savings-

bond program: to raise revenue for the United States Government." A.R. 24.  It added that the

laws would "frustrate the federal scheme" by substituting the relevant state as the obligor on the

escheated bond and "undermin[ing] the streamlined redemption procedure established by federal

regulations." A.R. 25.

C.  Kansas's Title-Escheatment Statute and Redemption Efforts

Soon following the Treasurer of New Jersey litigation, Kansas proceeded to test—with

Treasury and then in court—the validity of its own *title*-escheatment statute, passed in 2000.  See

H.B. 2648, 2000 Kan. Sess. Laws ch. 125 (codified at Kan. Stat. §§ 58-3979 & 58-3980) (A.R.

1233–34).  The Kansas statute differed from the previously litigated "custody" escheatment

regime in one key respect:  It conveyed to the state title, not merely custody, of bonds deemed

abandoned.  In 2013, Kansas State Treasurer Ron Estes requested payment from Treasury in the

amount of $876,836.18 for bonds in the state's possession and escheated in accordance with the

statute, and an additional $151.8 million for escheated bonds *not* in its possession.  A.R. 200–03.

Treasury agreed to redeem the bonds in Kansas's possession, but not the absent bonds,

explaining that its interpretation of the applicable regulations "allow[ed] some state escheatment

claims, but only when the state possesses the savings bonds in its claim."  A.R. 298–99.

On the merits, the question was whether Treasury's regulations required it to recognize

Kansas then filed suit in the Court of Federal Claims, seeking to compel Treasury to

honor its payment requests on the bonds it did not possess.  A.R. 784–822.  Treasury moved to

dismiss Kansas's contract-based claims for lack of jurisdiction, and moved to dismiss the entire

case for failure to state a claim.  As for jurisdiction, the Department took the position that Kansas

was not the owner of the bonds in question, and so there was no implied or express contract

between the state and Treasury which could form the basis for jurisdiction in the Court of

Federal Claims.  See 28 U.S.C. § 1491(a)(1) (defining the contract-based jurisdiction of the

Court of Federal Claims).  The court denied Treasury's jurisdiction-based dismissal motion,

concluding that the Department's arguments were not jurisdictional but rather went "to the

merits of Kansas's contract claims."  Estes v. United States, 123 Fed. Cl. 74, 82 (2015) ("Estes

I").

On the merits, the question was whether Treasury's regulations required it to recognize

Kansas's claims based on the state's title-escheatment statute.  As mentioned above, escheatment

proceedings were—at the time—nowhere mentioned in the regulations, so the dispute centered

upon whether Kansas's claim qualified as a "claim against an owner of a savings bond . . .

established by valid, judicial proceedings . . . as specifically provided in this subpart."  31 C.F.R.

§ 315.20(b).  While Treasury argued that the provision covered "only those claims of ownership that arise out of the types of judicial proceedings explicitly referenced" in the same subpart, see 31 C.F.R. § 315.21–22, Kansas viewed "the phrase 'valid, judicial proceedings' . . . as a catchall category," broad enough to include the state's title-escheatment proceedings.  Estes I, 123 Fed. Cl. at 84.  Based on a reading of the regulations, as then written, the court concluded that Kansas's interpretation was "more persuasive."  Id. at 86.  And while the court did not find Treasury's "interpretation [to be] 'plainly erroneous or inconsistent with the regulation,'" id. at 86 (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)), it declined to afford that interpretation deference on the grounds that Treasury's litigating position conflicted with its prior interpretations of the regulations.  In particular, the court emphasized Treasury's prior conflicting views as expressed in its briefing during the Treasurer of New Jersey litigation, where the Department had observed that a third party may "obtain[] ownership of [a] bond through valid judicial proceedings," and that "[a] State may satisfy this ownership requirement through escheat."  Id. at 87 (quoting Br. for Appellees at 6, Treasurer of New Jersey, 684 F.3d 382). That contradicted Treasury's position before the Court of Federal Claims—that escheatment claims, if recognized, were redeemed under Treasury's "waiver authority," 31 C.F.R. § 315.90. Because the court could not square "Treasury's litigating position . . . with its prior statements," it could not conclude that the Department's "new position" warranted deference, as an expression of "the agency's considered judgment."  Estes I, 123 Fed. Cl. at 90.  The court therefore adopted Kansas's interpretation of the regulations, and concluded there was a plausible claim for relief.  Id.

D.  The Rulemaking

Meanwhile, in July 2015, after Kansas had filed suit in the Court of Federal Claims but before the Estes I opinion on Treasury's motion to dismiss, Treasury published a Notice of Proposed Rulemaking ("NPRM"), seeking "to explicitly address state escheat claims to unclaimed savings bonds." 80 Fed. Reg. 37559, 37560.[2] More specifically, the new rule would "define[] the scope of the judicial proceedings covered by [31 C.F.R. § 315.20 and other related regulatory provisions]," and "establish[] a new procedure for states to submit escheat claims under their unclaimed property statutes." Treasury would now have the "discretion to recognize an escheat judgment that purports to vest a state with title to a [matured but unredeemed] savings bond . . . in the state's possession" when there is sufficient evidence that the bond has been abandoned. Id. But the proposed rule would not recognize "[e]scheat judgments that purport to vest a state with title to bonds that the state does not possess." Id.

After a comment period, in December 2015, Treasury promulgated the Rule, 80 Fed. Reg. 80,258 (codified at 31 C.F.R. §§ 315.88, 353.88, 360.77), which substantially tracks the NPRM.  In short, the Rule provides that for states' claims for payment on escheated bonds to be recognized, the states must have possession of those bonds, they must have "made reasonable efforts to provide actual and constructive notice of the state escheatment proceeding" and an opportunity to respond to all interested parties, and there must in all events be sufficient evidence of abandonment.  Rule at 80,263.  Consistent with Treasury's litigating position before the Court of Federal Claims in Estes I, the Rule locates the regulatory authority for recognizing claims on

---

[2] The Estes I court was aware of the NPRM, but expressly noted that it did "not consider the [NPRM] relevant in any way to the proper interpretation of the existing regulations at issue in this case." Estes I, 123 Fed. Cl. at 90 n.13.

escheated bonds not in the "valid, judicial proceedings" clause of 31 C.F.R. § 315.20(b), but as a

discretionary "waiver" of the regulatory provisions under 31 C.F.R. § 315.90.  Rule at 80,260.

The Rule also responds at length to numerous comments, including the alleged inconsistencies

between the Rule and prior Treasury statements regarding the validity of escheatment

proceedings.  Id. at 80,261.

  E.  Procedural History

Plaintiffs filed suit in this Court in March 2016.  They contend that the Rule is arbitrary and

capricious in violation of the APA, that it violates the Constitution's Appointments Clause and

Tenth Amendment, and that it illegally confers the power to review state court judgments to a

federal agency.  Treasury moved to dismiss and for summary judgment, contesting each of

Plaintiffs' claims.  Plaintiffs cross-moved for summary judgment.[3]  The Court heard argument on

the motions on November 10, 2016.

## II.  Legal Standards

When an agency action is challenged under the APA, "[s]ummary judgment . . . serves as

the mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the [relevant] APA standard of review."  Coe

v. McHugh, 968 F. Supp. 2d 237, 240 (D.D.C. 2013); see also Sec. Indus. & Fin. Markets Ass'n

v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 399 (D.D.C. 2014)

("[T]he general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil

Procedure does not apply to a review of agency actions.").  As relevant to Plaintiffs' challenges

---

[3] Plaintiffs' position was supported by three amicus briefs, filed respectively by the State
of Ohio; the States of Indiana, Pennsylvania, Florida, South Carolina, Missouri, and Rhode
Island; and the National Association of Unclaimed Property Administrators.

here, the Court will "hold unlawful and set aside [any] agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C).

## III.   Analysis

### A.   Whether the Rule Constitutes an Unacknowledged Policy Change

Plaintiffs argue that the Rule is arbitrary and capricious on multiple grounds.  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  That said, it is the court's role to evaluate whether the "agency [has] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Plaintiffs' main arbitrary-and-capricious challenge is a claim that the Rule marked a change of agency policy, without any acknowledgment of that change.

 "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016). In other words, "[a]n agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books," but must "display awareness that it is changing position" and "show that there are good reasons for the new policy." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).  Otherwise, as an "[u]nexplained inconsistency," the policy shift is arbitrary and capricious. Nat'l Cable & Telecommunications Ass'n v. Brand X

Internet Servs., 545 U.S. 967, 981 (2005); see also Encino Motorcars, 136 S. Ct. at 2126; Fox Television, 556 U.S. at 516.

Plaintiffs assert that the Rule fails to acknowledge and grapple with two policy changes.[4] First, Plaintiffs claim that the Rule's possession requirement—that a state have possession of any escheated bond it seeks to redeem—conflicts with Treasury's past statements that it would honor payment requests pursuant to title-based escheatment.  Pls.' Mem. Supp. Cross-Motion Summ. J. ("Pls.' Cross-MSJ") 18–21.  Second, Plaintiffs contend that the discretionary nature of the Rule, which permits Treasury to evaluate whether "the State presents evidence satisfactory to [the Department] that the bond has been abandoned by all persons entitled to payment under Treasury regulations" even when a state has both title to and possession of the bond, 80 Fed. Reg. 80,264, is similarly inconsistent with past practice.  Pls.' Cross-MSJ 21–22.  Neither claim is adequately substantiated by the record.

### 1. Whether the Possession Requirement is a Policy Change

In support of their argument that the possession requirement is a policy change, Plaintiffs cite the informal guidance documents outlined above, each of which emphasizes that a state must

---

[4] Plaintiffs also contend that under the doctrine of issue preclusion, Treasury should be barred from even arguing that the Rule is consistent with prior policy statements in light of the Court of Federal Claims' conclusion to the contrary.  Pls.' Mem. Supp. Cross-Motion Summ. J. ("Pls.' Cross-MSJ") 17–18 (citing Estes I, 123 Fed. Cl. at 90).  That argument misses the mark: The referenced opinion—which denied in part a dismissal motion—is an interlocutory order, and only final judgments can preclude the litigation of issues and claims.  See Hoffman v. District of Columbia, 681 F. Supp. 2d 86, 92 (D.D.C. 2010).  Moreover, although the opinion warrants careful consideration, the Estes I court was tasked with evaluating whether deference was due to Treasury's *litigating position*, a question which turned in large part on the consistency of that position as compared to past agency statements.  In the meantime, Treasury promulgated a *rule*, and this Court's task is to evaluate whether that rule *altered a clearly established policy* without sufficient *explanation*.  The questions are distinct in numerous respects.

have title to—and not merely possession of—the escheated bonds it seeks to redeem.[5]  To

review, in the 1952 bulletin, the Secretary of the Treasury explained that the Department would

not redeem escheated bonds in the state's possession where it had only custody of the relevant

bonds, but that the "Department [would] pay one who succeeds to the title of the bondholder."

A.R. 3.  Treasury wrote a similar letter to the Kentucky Secretary of Revenue in 1983.  A.R. 5.

Beginning in 2000, on a Q&A webpage in response to a question regarding "securities that the

state has in its possession," Treasury stated that it would "recognize claims by States for payment

of United States securities where the States have succeeded to the title and ownership of the

securities pursuant to valid escheat proceedings."  A.R. 781, 783.  Finally, Plaintiffs cite

Treasury's brief opposing certiorari in the Treasurer of New Jersey litigation, where the

Department summarized the above guidance and once again emphasized that *title* ownership was

a prerequisite for the redemption of escheated bonds:  "[Treasury] has long advised the States

that to receive payment on a U.S. savings bond a State must complete an escheat proceeding that

satisfies due process and that awards title to the bond to the State, substituting the State for the

original bondholder as the lawful owner."  A.R. 14.

    Without a doubt, these various statements establish Treasury's longstanding policy that

payment requests for escheated bonds will not be honored unless a state has *title* ownership over

those bonds.  But the statements do not establish the opposite with respect to possession.  That is,

---

    [5] Additionally, for the first time in their Reply, Plaintiffs cite a 1982 letter from Treasury
to an assistant director at the Massachusetts Treasury Department.  See Pls.' Reply Supp. Cross-
MSJ ("Pls.' Reply") 7 n.3.  But as Treasury notes in its Sur-Reply—which the Court will grant
Treasury leave to file—the letter does not support "Plaintiffs' contention that [the Department]
previously interpreted its regulations to permit states to redeem savings bonds that they do not
possess," since the letter merely "responded to an inquiry from a state seeking to redeem bonds
*in its possession*."  Defs.' Sur-Reply 1 (emphasis added).  Nor does the letter suggest that
honoring payment requests for escheated bonds was, prior to the Rule, beyond Treasury's
discretionary reach.  As a result, the letter has no material impact on Plaintiffs' arguments.

they do not express a policy that a state may redeem bonds without possessing them.  Indeed, as Treasury points out, Plaintiffs "have not identified a single instance in which [the Department] redeemed a bond that a state did not possess, based on a judgment of escheat."  Defs.' Reply Mot. Summ. J. ("Defs.' Reply") 14.  And in all circumstances giving rise to the above policy guidance, the state *did* have possession of the escheated bonds,[6] so there was simply no reason for Treasury—in explaining why the state's payment request was deficient—to opine on whether possession, too, was required.  In this respect Treasury was no more "inconsistent" than a shopkeeper who one day refuses service to a man with a shirt on the grounds that he is not wearing shoes, and the next day does the same to a man wearing shoes on the grounds that he lacks a shirt.

Put another way, Plaintiffs' "attempt to infer from [Treasury's] silence the existence of a contrary policy fails because [none of the cited correspondence] purport[s] to be a comprehensive review of all conditions that might be placed on" payment for escheated bonds. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 516 (1994).  Rather, Treasury's past statements merely offered piecemeal guidance in response to particular problems.  For example, the 1952 Treasury Bulletin sought to "throw some light on [a hypothetical] legislative project" by reference to four specific bonds, A.R. 1–2, and the 1983 letter to the Kentucky Secretary of Revenue concluded by noting that if the state were to obtain title to the bond in question,

---

[6] There is one exception here: The states pursuing custody-escheatment claims during the Treasurer of New Jersey litigation—in the course of which the Solicitor General's brief in opposition to certiorari emphasized the title requirement—did *not* have possession of the bonds in question.  See A.R. 14.  But neither did the states have title, so addressing the deficiency in title was sufficient to explain the rejection of their requests for payment.  Moreover, in letters sent to those states prior to the litigation, Treasury *did* specify that possession was required for the redemption of escheated bonds.  A.R. 102–03, 106–07, 110–11, 114–15, 118–19, 124–25, 126–27.

"additional consideration [would] be given [to its] request," A.R 5.  Accordingly, "the mere failure to address [a possession requirement] hardly establishes an inconsistent policy on the part of [Treasury]."  <u>Thomas Jefferson Univ.</u>, 512 U.S. at 516

Lack of possession was simply not a relevant potential deficiency in escheat proceedings until the year 2000, when Kansas and numerous other states for the first time sought to redeem bonds that were not in their possession.  Soon after, Treasury's correspondence began to specify that both title *and* possession were necessary components of valid escheated bond payment requests.  <u>See, e.g.</u>, A.R. 106–07 (April 2004 Treasury Letter to Kentucky Treasurer) ("In order for the bonds to be paid to Kentucky, *the commonwealth must have possession of the bonds*, statutory authority to obtain title to the individual bonds, obtain an order of escheat from a court of competent jurisdiction vesting title in the state to the individual bonds, and apply to the Department of Treasury for payment." (emphasis added)); A.R. 114–15 (April 2004 Treasury Letter to Illinois Treasurer) (same); A.R. 124–25 (April 2004 Treasury Letter to North Carolina Treasurer) (same); A.R. 118–19 (May 2004 Treasury Letter to New Hampshire Treasurer) (same); A.R. 102–03 (August 2004 Treasury Letter to South Dakota Treasurer) (same); A.R. 110–11 (August 2004 Treasury Letter to Connecticut Treasurer) (same); A.R. 126–27 (October 2006 Treasury Letter to Chief Counsel for the Florida Chief Financial Officer) ("Payment on a bond may only be made to the owner of the bond upon presentation and delivery of the bond.").[7]

---

[7] Plaintiffs fault Treasury for failing to cite these letters in prior litigation or in the NPRM, <u>see</u> Pls.' Cross-MSJ 19 & n.17, but Treasury identified the letters in the Rule in response to comments that the Rule effected a change in position.

Accordingly, the possession requirement is best viewed as a clarification of prior guidance, not the abrupt policy reversal that Plaintiffs contend.

### 2.   *Whether the Discretionary Aspect of the Rule is a Policy Change*

Plaintiffs also argue that the discretionary nature of the Rule, under which Treasury may evaluate whether the state has presented sufficient evidence that the bond in question has been abandoned by its registered owner and has carried out its escheatment in accordance with due process, see Rule at 80,264, reflects an unexplained policy change.  The support for this claim is rather thin.  Plaintiffs cite Treasury's 2013 letter to Kansas agreeing to repay bonds in its possession "in the normal course," A.R. 297; language in the 1952 Treasury Bulletin that "the Department *will* pay one who succeeds to the title of the bondholder," A.R. 3 (emphasis added); and language from the 1983 Treasury Letter stating that "claims by States for payment of United States securities *will* be recognized only where the States have actually succeeded to the title and ownership of the securities," A.R. 5 (emphasis added).  Pls.' Cross-MSJ 22.  These statements, Plaintiffs suggest, demonstrate that Treasury's prior regulations *required* it to recognize a state's escheatment of title.

Yet there are numerous statements in the very same documents Plaintiffs cite to suggest that Treasury has previously recognized its discretion in evaluating whether a state has complied with due process and has put forth sufficient evidence of abandonment in accordance with its escheatment proceedings.  See, e.g., A.R. 5 (1983 Treasury Letter) ("If the requirements [of the relevant state title escheatment statute] have been met, please furnish [Treasury] appropriate evidence of such action, and upon receipt, additional consideration will be given to your request."); A.R. 14 (Treasurer of New Jersey Opposition to Certiorari Memo) ("[T]he Department has long advised the States that to receive payment on a U.S. savings bond a State

17

must complete an escheat proceeding that satisfies due process[.]").  And as Treasury points out, the Department's longstanding regulations provide that only "valid" judgments, supported by certain types of evidence and documentation, will be recognized.  31 C.F.R. §§ 315.20, 315.23. Defs.' Reply 26–27.  See also A.R. 781, 783 (Q&A Webpage) ("Treasury will recognize claims by States for payment of United States securities where the States have actually succeeded to the title and ownership of the securities pursuant to *valid* escheat proceedings." (emphasis added)).

In short, there is no persuasive evidence that, prior to the Rule, Treasury followed a no-questions-asked approach to evaluating state escheatment proceedings.  Rather than *introducing* discretion into Treasury's policy regarding payment on escheated bonds, the Rule simply elaborated on the standards by which that discretion would be exercised.

### 3.   *Whether Other Apparent Inconsistencies Invalidate the Rule*

Although the Rule effected no reversals in *policy*, certain aspects of Treasury's *reasoning* in promulgating the Rule were inconsistent with prior rationales.  During the Treasurer of New Jersey litigation, the Department indicated that escheatment proceedings conferring title on a state, so long as they complied with certain due process requirements, were properly recognized as "valid, judicial proceedings" under 31 C.F.R. § 315.20(b).  See, e.g., A.R. 13–14.[8]  But the Rule interprets that same provision "to apply only to [certain, specifically listed] adverse proceedings" that do *not* include escheat.  Rule at 80,262.  It locates Treasury's authority to pay

---

[8] None of the other guidance documents at issue here—i.e., the 1952 bulletin, the 1982 letter cited in Plaintiffs' Reply, the 1983 letter, the 2000 webpage, or the 2004/2006 letters—cites 31 C.F.R. § 315.20(b) as authorizing the recognition of escheatment proceedings.  Plaintiffs make much of Treasury's statement in its 2013 letter to Kansas, regarding bonds in the state's possession, that "[a]ssuming the savings bonds you surrender are legitimate and have not previously been redeemed, we anticipate redeeming them in the normal course after receiving the information listed above."  A.R. 297.  But nothing in this letter, including the phrase "in the normal course," identifies 31 C.F.R. § 315.20(b) as providing the basis for the redemption.

escheated bond claims instead in the Department's "waiver authority," 31 C.F.R. § 315.90.  See Rule at 80,260–61.  There is also some inconsistency in Treasury's concern regarding double-payment.  Treasury's title requirement was based on the rationale that "payment of . . . securities [to which a state has title] results in full discharge of the Treasury's obligation[.]"  A.R. 781 (Q&A Webpage).  If that is so, the risk of having to pay multiple claims on the same bonds would appear to be eliminated.  Now, Treasury's view is that—even for title-escheated bonds— "[t]he potential for competing claims exposes Treasury to the risk of double-payment," thus necessitating the possession requirement and other evidence of abandonment.  Rule at 80,259.

These contradictions are not sufficient to render the Rule arbitrary and capricious, however.  First, whether Treasury locates its authority to recognize escheated bonds in 31 C.F.R. § 315.20 or 31 C.F.R. § 315.90 has no bearing on the possession requirement, or on Treasury's ability to evaluate the validity of state escheatment proceedings according to the standards it sets. Even if Treasury recognized escheatment proceedings under 31 C.F.R. § 315.20's "valid, judicial proceedings" provision, Treasury would retain the discretion to evaluate whether those proceedings were indeed "valid."  After all, "Treasury has never maintained that it would recognize every title escheat judgment."  Rule at 80,262.  And "[t]o the extent there [was] any ambiguity about the scope of 'valid' proceedings under [31 C.F.R. § 315.20(b)], the final rule [clarifies] that Treasury may review judicial proceedings to determine whether they provided due process, complied with the savings bond regulations, and complied with relevant state law."  Id. As discussed below, see infra section III.B.2, the possession requirement, which is intended to

assure sufficient evidence of abandonment, is similarly justified as a prerequisite for determining "valid" escheatment proceedings.

Nor does the apparent inconsistency in Treasury's stated fear of double-payment render the Rule arbitrary and capricious, for the simple reason that this was not the only—or even the primary—basis for the Rule.  For one thing, as noted in the Rule, Treasury is concerned not only about the possibility for double-payment on claims, but also about the possibility of "costly litigation."  Rule at 80,259.  Even if—consistent with Treasury's past statements—honoring a title-escheated bond fully discharges the Department's payment obligations, surely it would not extinguish the need for Treasury to engage in litigation or to develop other administrative proceedings in the event of conflicting claims.  In other words, even if there is only one lawful owner of a bond, there must still be a process for determining who that lawful owner is, and it is quite reasonable for Treasury to seek to avoid the costs of *that* sorting-out process.[9]

There is also a second reason why any inconsistency in the double-payment rationale is harmless: The Rule was aimed not only at avoiding conflicting claims, but at "protect[ing] the rights of savings bond owners."  Rule at 80,260.  Treasury's worry was that title-escheatment statutes, like the custody-escheatment statutes discussed at length by the Third Circuit in Treasurer of New Jersey, would "alter the terms of the contracts between the United States and the bond owners," absent clarifying regulations.  Rule at 80,259.  Among other concerns,

---

[9] The Court also notes that this concern is not only reasonable, but likely, where Treasury and bondholders are faced with a patchwork of state escheatment regimes, all purporting to convey title according to different timelines and procedures, and based on different evidence.  As Treasury explained, "[t]he new title escheat statutes . . . creat[e] the potential for multiple claims over the same bonds," not only because "a state may attempt to claim bonds that are still in the possession of registered owners," but also because a "state may . . . attempt to claim bonds that are in the possession of another state, where both states have a claim to title under their own state laws."  Rule at 80,259.

Treasury noted that under some title-escheatment statutes, "bonds are presumed abandoned even if they have not matured and are in the owner's possession," Rule at 80,259; that often, bond owners "are not parties to . . . escheat proceeding[s], and may never learn that the state is attempting to claim title over their bonds, especially if they live out-of-state," id.; that absent due process protections, "savings bond owners would need to monitor state laws, newspapers, and judicial proceedings in states where they may not live in order to protect their rights," id.; that "[t]he rigor of state efforts to locate bond owners . . . would be outside federal control," id. at 80,260; and that "states may impose burdensome [redemption] processes on former owners who seek payment, and may not pay former owners in full," id.  These concerns are all relevant to the protection of bondholder rights, and to "advancing the goal of making [savings] bonds 'attractive to savers and investors.'" Treasurer of New Jersey, 684 F.3d at 407 (quoting Free, 369 U.S. at 669)).  The Third Circuit concluded that this rationale was *alone* sufficient to justify the preemption of state custody-escheatment statutes.  Indeed, the court made clear that its holding was in no way "predicat[ed] . . . on a conclusion that honoring a [custody-escheatment statute] might subject the United States to multiple liabilities on a single bond." Treasurer of New Jersey, 684 F.3d at 409 n.26.  Analogously, the Rule is not alone "predicated" on Treasury's fear of double-payment.

Finally, even assuming *arguendo* a policy or rationale change, there is no APA requirement that a promulgated rule be in harmony with all previous agency litigating positions and policy guidance.  What matters is that an agency not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." Fox Television, 556 U.S. at 514.  That did not happen here.  During the rulemaking process, Treasury engaged with all of the purportedly inconsistent statements that Plaintiffs now identify.  For example, Treasury considered certain

commenters' view that the Rule's "waiver" justification contradicted its prior statements

regarding the "valid, judicial proceedings" provision, explained that the Rule's approach was

consistent with most of Treasury's prior statements on the subject, and noted that "[t]o the extent

there is any ambiguity in Treasury's prior statements on the applicability of [the judicial

proceedings subpart] to escheat proceedings, the [Rule] is intended to clarify these statements:

[the subpart] does not apply to escheat proceedings." Rule at 80,262. Accordingly, "[g]iven the

care the [Department] took to explain its prior actions," there is "no basis for concluding that it

'casually ignored' prior policies and interpretations or otherwise failed to provide a reasoned

explanation for its [Rule]." Cablevision Sys. Corp. v. F.C.C., 649 F.3d 695, 710 (D.C. Cir.

2011) (quoting Dillmon v. Nat'l Transp. Safety Bd., 588 F.3d 1085, 1089 (D.C. Cir. 2009)).

Nor is the Court persuaded by Plaintiffs' comparison of this case to Encino Motorcars,

where the agency "offered barely any explanation" for an *undisputed* change in a policy on

which there had been "decades of industry reliance." 136 S. Ct. at 2126. Here, Treasury

extensively explained its Rule and its view as to why that Rule did not contradict prior

statements. And in light of the fact that Treasury has *never* honored a payment request for

escheated bonds not in a state's possession, states cannot reasonably have relied on any

purported policy of redeeming absent bonds.[10] The Court thus concludes that Treasury did not

arbitrarily and capriciously depart from a prior position in promulgating the Rule.

B. Whether the Rule is Otherwise Arbitrary and Capricious

Aside from asserting there was an unacknowledged policy change, Plaintiffs argue that

the Rule is arbitrary and capricious on multiple other grounds. The Court considers these

---

[10] The Court is also unpersuaded by Plaintiffs' related argument that the Rule is arbitrary
and capricious because Treasury failed to grapple with "key precedent." Pls.' Cross-MSJ 23.
Plaintiffs fault Treasury for not engaging more thoroughly with Estes I, 123 Fed. Cl. 74, or

challenges under the same "narrow" standard of review, <u>State Farm</u>, 463 U.S. at 43, evaluating

whether Treasury has "articulate[d] a satisfactory explanation for its action[,] including a

'rational connection between the facts found and the choice made.'" <u>Id.</u> (quoting <u>Burlington</u>

<u>Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)).

1.   *Whether Treasury Adequately Weighed Evidence of State Unclaimed Property*
    *Programs*

Plaintiffs complain that Treasury "ignored" certain record evidence demonstrating that

states have effective and beneficial unclaimed property programs, and that the Rule therefore

arbitrarily failed to establish a "rational connection between the facts found and the choice

made." Pls.' Cross-MSJ 31–32 (quoting <u>State Farm</u>, 463 U.S. at 43). This assertion cannot be

squared either with the Rule itself—in which Treasury directly engages the states' contention

that their unclaimed property programs better equip them to reunite bondholders with bond

proceeds—or with a common-sense understanding of title-based escheatment.

In announcing the Rule, Treasury clearly acknowledged commenters' view that "[s]tates

should have the role of locating bond owners . . . in part because states already have effective

---

Treasurer of New Jersey, 684 F.3d 382. But <u>Estes I</u> is no more than an interlocutory order, and
Treasury expressly acknowledged that litigation as one of the numerous circumstances giving
rise to the need for a clarifying rule. <u>See</u> NPRM at 37,559–60. Moreover, much of the Rule's
discussion—including its document-by-document refutation of the view that the Rule conflicts
with past practice—is in substance if not in form a thorough engagement with <u>Estes I</u>. As for
Treasurer of New Jersey, that opinion's extensive discussion of the "multiple ways" in which
"unclaimed property acts conflict with federal law regarding United States savings bonds," 684
F.3d at 407, bolsters rather than undermines Treasury's rationale. <u>See</u> Rule at 80,259. At oral
argument, Plaintiffs pointed to a single footnote in the opinion, saying it contradicts the Rule.
<u>See</u> <u>Treasurer of New Jersey</u>, 684 F.3d at 413 n.28. Far from it: The footnote actually hints that
the court might find the same preemptive conflict if faced with a title-based (rather than custody-
based) escheatment regime, and in that context, the court refers to the prospect of Treasury
"abandon[ing] its long held position" as reflected in the Q&A webpage discussed above. <u>Id.</u> But
Treasury has *not* abandoned that position, which was premised on bond possession, since
Treasury will continue to honor title-based escheated bonds under clearly defined circumstances.

unclaimed property programs," and their concern that "[b]ecause the proposed rule does not allow states to take title to bonds they do not possess . . . states cannot assist in locating most owners of matured, unredeemed bonds."  Rule at 80,260.  Without denying that some states had effective unclaimed property programs, Treasury nevertheless rejected the conclusion that these programs were the best mechanism for protecting bondholder rights, not only because "[t]he rigor of state efforts to locate bond owners . . . would be outside federal control," but also because "[o]nce in possession of bond proceeds, states [would] have little incentive to locate a bond's former owner, particularly if that owner lives in another state."  Id.  Citing a provision of the Arkansas legal code, Treasury went on to observe that some "states may impose burdensome processes on former owners who seek payment, and may not pay former owners in full."  Id.  Treasury concluded by "encourag[ing]" states to "assist in locating the owners of bonds . . . through advertising and other methods to persuade their citizens to redeem savings bonds that have matured," noting that "[t]hese efforts can continue without impairing a bond owner's title and rights under the [relevant] savings bond contract."  Id.

This response is eminently reasonable.  While states may have a track record, as a general matter, of returning unclaimed property to rightful owners, see A.R. 80–81, they have not presented comparable evidence of success with respect to the title escheatment statutes at issue here.  Kansas, for example, purportedly paid out "tens of thousands of dollars worth of claims" after redeeming the bonds it possessed and gained title to under its escheatment statute—but that was out of $876,836.18 total.  See Estes I, 123 Fed. Cl. at 79.  In other words, the available evidence is not at odds with the conclusions of other courts that the motivation behind title escheatment statutes may be something shy of "benevolent."  Treasurer of New Jersey, 684 F.3d at 390; see also Louisiana Health Serv. & Indem. Co. v. McNamara, 561 So. 2d 712, 716 (La.

1990) ("Although one purpose of such acts is to protect the missing owners, the primary rationale behind this legislation is its use as a revenue raising device.").  Suffice it to say that Treasury did not "ignore" evidence that some states have successful unclaimed property programs in promulgating its Rule.  Rather, it acknowledged such programs' existence, but disagreed with certain commenters that the Rule would hinder the states' efforts to "reunite" bondholders with abandoned bonds.  Treasury's disagreement was explained, and far from arbitrary.

### 2.   *Whether the Rule is Based on an Erroneous Interpretation of Property Law*

Plaintiffs next argue that the possession requirement—i.e., that states must possess the escheated bonds they seek to redeem—is arbitrary and capricious because its rationale is "based on an improper understanding of the law."  Pls.' Cross-MSJ 34 (quoting Oceana, Inc. v. Penny Pritzker, 26 F. Supp. 3d 33, 41 (D.D.C. 2014)).  In particular, Plaintiffs say Treasury's worry about double-payment on bonds not in a state's possession is misguided because "Treasury has always maintained that title trumps possession," and no legal provision grants the holder of a savings bond the right to redeem it where ownership of the bond has been transferred.  Id. at 35–36.  In other words, Plaintiffs insist, there can be no threat of conflicting ownership claims where a state has title to the bond that is redeemed.

As discussed above, however, see supra section III.A.3, Treasury's concern is not merely that there would be more than one lawful owner, but that the process of determining and allocating payment to that proper owner would be "costly."  Rule at 80,259.  That is surely a valid concern, as Treasury explained, not only because "a state may attempt to claim bonds that are still in the possession of registered owners," but also because a "state may . . . attempt to claim bonds that are in the possession of another state, where both states have a claim to title

under their own state laws." Rule at 80,259.  Where ownership can be determined by

registration, <u>see</u> 31 C.F.R. § 315.5(a), or by a patchwork of state escheatment procedures

purporting to convey title in the absence of possession, no doubt there *will* be conflicting

ownership *claims*—even if only one of those ownership claims turns out to be valid.

     Plaintiffs contend that "Treasury erroneously fears that the former owner with possession

of the proper savings bond could make a valid claim for redemption after an escheat judgment

transfers title to the State."  Pls.' Cross-MSJ 35.  But Treasury never claimed that possession

alone could establish a conflicting ownership claim—in other words, the Department never

claimed that *possession* trumped *title*.  Rather, as Treasury thoroughly explained in its Rule, the

possession requirement is material because it evidences *abandonment* by the original, registered

owner:

> The proposed rule disallows escheat claims for "unclaimed" bonds that are not in a
> state's possession in part because states cannot produce sufficient evidence that
> these bonds are abandoned.  States typically have little information about bonds
> that are not in their possession.  . . .  The states presumed that the bonds were
> abandoned based on a deadline in state law, a concept that is alien to Treasury's
> savings bond regulations.  In contrast, a state in possession of a bond may be able
> to show that the bond is abandoned. . . .  The fact that a state possesses the bond is
> itself evidence, though not conclusive, that the bond has been abandoned.  Such
> evidence is unavailable when a state does not possess the bonds.

Rule at 80,261.  That is, where a bond has been abandoned, there is no real threat of a subsequent

conflicting claim of ownership from the former registered owner.  Furthermore, the possession

requirement ensures that Treasury will not be faced with conflicting claims from numerous

states, since clearly only one state can be in possession of a uniquely identified bond.

     It may be that title to a bond and its proceeds is properly vested in only one lawful

owner, but that fact alone would not obviate the need for Treasury to engage in costly litigation

or administrative proceedings in order to resolve conflicting ownership *claims*.  The Rule is

therefore not arbitrary because grounded in legal error.[11]

### 3.  Whether the Rule Arbitrarily Discriminates Against State Owners

Plaintiffs make the brief argument, which they appear to abandon in their Reply, that by

"singl[ing] out claims for payment by *State* bond owners that have acquired ownership via title

escheatment and subject[ing] those claims to additional obstacles and an extra layer of

discretionary review" as compared to registered owners, Pls.' Cross-MSJ 37, the Rule arbitrarily

and capriciously "treat[s] similarly situated entities differently [without] support[ing] the

disparate treatment with a reasoned explanation and substantial evidence in the record," id.

(quoting Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin., 741 F.3d 1309,

1313 (D.C. Cir. 2014)).  But escheatment proceedings are available only to sovereigns, so any

rule governing those proceedings' validity as applied to bond ownership will necessarily

"single[] out" states.  As Treasury explains, Plaintiffs' disparate treatment "argument is just

another way of saying that [the Department] will not recognize certain redemption requests

based on escheat, and the final rule explains in detail why a state court judgment purporting to

transfer [a bond] title . . . to the state does not, standing alone, result in a change in ownership

under federal law."  Defs.' Reply (citing Rule at 80,258–60).  Because Plaintiffs' disparate

treatment argument merely repackages their other challenges on arbitrary-and-capricious

grounds, the argument fails for similar reasons.

---

[11] Plaintiffs' error-of-law challenge also fails for the independent reason that, as discussed above, see supra section III.A.3, Treasury's aim to protect the rights of the bondholder is *by itself* sufficient justification for the Rule.

C.  <u>Whether the Rule Was Promulgated in Violation of the Appointments Clause</u>

Plaintiffs mount another challenge to the Rule under the Appointments Clause of the U.S.

Constitution, which distinguishes between principal officers, who must be appointed by the

President and confirmed by the Senate, and "inferior" officers, who may be appointed by "the

President alone, . . . the Courts of Law, or . . . the Heads of Departments," if so provided by

Congress.  U.S. Const. art. II, § 2, cl. 2.  Plaintiffs argue that the Treasury Department official

who signed and promulgated the Rule, Fiscal Assistant Secretary David A. Lebryk—who as an

appointee of the Treasury Secretary is an inferior officer—nevertheless "exercised the authority

of a principal officer[.]"  Pls.' Cross-MSJ 24.  This, Plaintiffs contend, makes the Rule *ultra

vires*, in violation of the Appointments Clause.

*1.  Whether Plaintiffs Waived Their Appointments Clause Challenge*

Treasury urges the Court to avoid the merits of Plaintiffs' Appointments Clause challenge

altogether because Plaintiffs did not present the claim during the rulemaking comment period.

Defs.' Mem. Supp. Mot. Summ. J. (Defs.' MSJ") 29–30.  It is true that, as a general matter, "a

party must initially present its comments to the [relevant] agency during the rulemaking in order

for the court to consider the issue."  <u>Tex Tin Corp. v. EPA</u>, 935 F.2d 1321, 1323 (D.C. Cir.

1991).  But as Plaintiffs point out, that waiver rule is inapplicable where a party "had no way to

raise [an] argument until the [agency] issued its final rule."  Pls.' Cross-MSJ 25 (quoting <u>CSX</u>

<u>Transp., Inc. v. Surface Transp. Bd.</u>, 584 F.3d 1076, 1079 (D.C. Cir. 2009)).  That exception

applies here, where Plaintiffs' challenge rests on the promulgating official's identity, which was

only announced with the Rule's issuance.  Moreover, Treasury concedes that, as a matter of

discretion, this "Court certainly has the power to entertain an Appointments Clause challenge

that was not [previously] presented to the agency."  Defs.' Reply 30.  That discretion is properly

exercised "only in 'rare cases,'" <u>Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.</u>, 574

F.3d 748, 755 (D.C. Cir. 2009), but those unusual circumstances include challenges "to the very

power of the [agency] to act," <u>Noel Canning v. N.L.R.B.</u>, 705 F.3d 490, 497 (D.C. Cir. 2013).

Such is Plaintiffs' Appointments Clause challenge.  See <u>Freytag v. C.I.R.</u>, 501 U.S. 868, 879

(1991) (exercising discretion to hear an Appointments Clause challenge not raised below, since

the Clause protects constitutionally mandated structural interests).  For both of the above

reasons, the Court will consider the merits of Plaintiffs' Appointments Clause argument.

   *2. Whether the Fiscal Assistant Secretary is a De Facto Principal Officer*

   The Supreme Court "ha[s] not set forth an exclusive criterion for distinguishing between

principal and inferior officers for Appointments Clause purposes," <u>Edmond v. United States</u>, 520

U.S. 651, 661 (1997), but it has issued the following guidance:

> Generally speaking, the term "inferior officer" connotes a relationship with some
> higher ranking officer or officers below the President: *Whether one is an "inferior"*
> *officer depends on whether he has a superior.*  It is not enough that other officers
> may be identified who formally maintain a higher rank, or possess responsibilities
> of a greater magnitude.  If that were the intention, the Constitution might have used
> the phrase "lesser officer."  Rather, in the context of a Clause designed to preserve
> political accountability relative to important Government assignments, we think it
> evident that *"inferior officers" are officers whose work is directed and supervised*
> *at some level by others* who were appointed by Presidential nomination with the
> advice and consent of the Senate.

<u>Id.</u> at 662–63 (emphasis added).  The D.C. Circuit summarized <u>Edmond</u>'s analysis as

"emphasiz[ing] three factors": (1) the degree of supervision over the officer in question by a

principal officer or those in the principal officer's supervisory line; (2) whether the officer in

question is removable without case; and (3) whether the decisions rendered by the officer in

question are reversible.  <u>Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.</u>, 684 F.3d

1332, 1338 (D.C. Cir. 2012).

In arguing that the Fiscal Assistant Secretary is a *de facto* principal officer, Plaintiffs lean heavily on what they characterize as <u>Intercollegiate</u>'s three-pronged "test." Pls.' Cross-MSJ 26. Plaintiffs concede that the Fiscal Assistant Secretary is removable without cause by the Treasury Secretary, thus satisfying "prong" number two. <u>Id.</u> But they argue that the Fiscal Assistant Secretary "failed the first and third prongs," since "his decision was neither subject to oversight, nor to reversal or correction, by a principal officer." <u>Id.</u> at 26.

This argument suffers from two critical flaws. First, Plaintiffs' main point is that Fiscal Assistant Secretary Lebryk "lacked any meaningful oversight or supervision in promulgating the Rule[.]" Pls.' Cross-MSJ 29. Plaintiffs cite certain of Treasury Secretary Lew's public statements to suggest that he was "entirely unaware of the . . . rulemaking efforts," <u>id.</u> at 28, and they discern "no reason to think the [Fiscal] Assistant Secretary obtained approval of the Rule . . . by any principal officer," Pls.' Reply Supp. Cross-MSJ ("Pls.' Reply") 14. In other words, Plaintiffs largely take issue with the particular *process* Treasury utilized in arriving at this *particular* agency decision. But Appointments Clause challenges are properly structural, not procedural. In evaluating such challenges, reviewing courts do not evaluate the degree of supervision or reversal authority actually exercised by superiors regarding the particular agency decision at issue, but rather the extent to which relevant statutes or regulations provide for such oversight as a structural matter. <u>See, e.g.</u>, <u>Edmond</u>, 520 U.S. at 663–64 (citing provisions of the Uniform Code of Military Justice in evaluating the Judge Advocate General's oversight of the Coast Guard Court of Criminal Appeals); <u>Intercollegiate</u>, 684 F.3d at 1338–39 (citing various provisions of the Copyright Royalty and Distribution Reform Act of 2004, 17 U.S.C. § 801 *et seq.*, in assessing the degree of supervision exercised over Copyright Royalty Judges).

A review of the relevant organizational framework, as established by statute and agency directive, makes clear that the Fiscal Assistant Secretary is "inferior" because he has multiple "superior[s]," in the sense that his "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." Edmond, 520 U.S. at 662–63. The Fiscal Assistant Secretary "carr[ies] out [only those] duties and powers prescribed by the Secretary," a principal officer, 31 U.S.C. § 301(d), and a Department Order provides that the Fiscal Assistant Secretary "shall report" directly to one principal officer, the Under Secretary for Domestic Finance, who in turn reports to another principal officer, the Deputy Secretary. Dep't of the Treasury Order 101-05 (Dec. 17, 2015), *available at* https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to101-05.aspx. The Deputy Secretary reports to the Secretary. Id. A Treasury Department directive further provides that regulations be submitted from policy officials to the Executive Secretary for review, accompanied by a "memorandum [which] shall, at a minimum, fully, clearly, and succinctly . . . describe the regulation [and] explain the reason it is being issued." Treasury Directive 28-01 § 5(c)(1) (July 17, 1989), *available at* https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/td28-01.aspx.

Aside from framing its Appointments Clause challenge in procedural rather than structural terms, Plaintiffs also err in presuming that all three of the Intercollegiate factors are to be weighed independently and equally. The Supreme Court has recognized that "[t]he power to remove officers . . . is a powerful tool for control," Edmond, 520 U.S. at 664, which suggests that particularly where an officer may be removed without cause, that arrangement alone implies a significant degree of oversight. Perhaps this is why courts—including the Supreme Court—have repeatedly considered special or independent counsel to be inferior officers despite their being

free of regular supervision.  <u>See</u>, <u>e.g.</u>, <u>Morrison v. Olson</u>, 487 U.S. 654, 671–72 (1988)

(affirming validity of independent counsel arrangement where official was removable *for cause*

by the Attorney General and had circumscribed duties and tenure); <u>United States v. Hilario</u>, 218

F.3d 19, 25 (1st Cir. 2000) (finding persuasive the conclusion that "independent counsels are

inferior [officers] despite limited supervision"); <u>United States v. Gantt</u>, 194 F.3d 987, 999 (9th

Cir. 1999) ("supervision by a superior officer is a sufficient but perhaps not a necessary

condition to the status of inferior officer"), <u>overruled on other grounds by</u> <u>United States v. W.R.</u>

<u>Grace</u>, 526 F.3d 499 (9th Cir. 2008); <u>United States v. Libby</u>, 429 F. Supp. 2d 27, 44 n.16 (D.D.C.

2006) (rejecting the argument that, because "the Deputy Attorney General did not supervise any

of the Special Counsel's activities" the Special Counsel was a principal officer, on the grounds

that "such independence does not alter the fact that the Special Counsel can be removed at any

time and for any reason").  It is telling that Plaintiffs have failed to identify a single case

concluding that an at-will officer—removable without cause by a principal officer—was herself

principal.[12]

        The Fiscal Assistant Secretary's "work is directed and supervised at some level by others

who were appointed by Presidential nomination with the advice and consent of the Senate."

<u>Edmond</u>, 520 U.S. at 663.  Accordingly, his appointment as an inferior officer was

constitutionally valid, and the rule he promulgated was not *ultra vires*.

        D.  <u>Whether the Rule Authorizes the Improper Review of State Judgments</u>

        As explained above, the Rule permits Treasury to evaluate whether a state has presented

sufficient evidence of abandonment, and also whether a state's escheatment proceedings

---

        [12] It might also be noted that <u>Intercollegiate</u>'s third factor, the reversibility of an official's
decisions, is less relevant here, where the Court must evaluate the status of a policymaking
official rather than an adjudicative body like those at issue in <u>Edmond</u> and <u>Intercollegiate</u>.

comported with due process, as assessed by the Department.  See Rule at 80,264.  Plaintiffs

argue this is "doubly problematic" because it "arrogates what is essentially appellate review of a

final state-court judgment to a federal agency with no such authority or competence, in violation

of 28 U.S.C. § 1257," and because Treasury is not statutorily authorized "to assess [a] state

court's compliance with the Constitution's Due Process clause."  Pls.' Cross-MSJ 38–39.

        In response to Plaintiffs' claim that Treasury is improperly reviewing state judgments, the

Department maintains that "is not engaging in judicial appellate review," but rather is

"determin[ing] whether the savings bonds are in fact 'abandoned' for purposes of the federal

regulations governing the savings bond program."  Defs.' Reply 41.  "A determination by

Treasury that it will not pay a particular redemption request based on a state judgment of escheat

does not reverse the judgment of the state court," Treasury continues, but "simply provides that

the judgment is not sufficient to divest the registered owners of their rights under federal law."

Id.

        Plaintiffs characterize this argument as "semantic," Pls.' Reply 21, but the distinction

Treasury draws is clearly one of substance.  Two bodies of law are at issue: a state law of escheat

and a federal law of bond ownership.  State court judgments are final regarding the former, but

Treasury—by operation of the Supremacy Clause and pursuant to its statutorily-delegated

authority, see 31 U.S.C. § 3105—may promulgate rules to define the latter.  For obvious reasons,

state-court judgments in accordance with state laws purporting to define the parameters of

federal savings bond ownership cannot tie the hands of a federal agency Congress has

specifically entrusted with that very task.  See Treasurer of New Jersey, 684 F.3d at 409 ("The

States' efforts to impose the status of 'abandoned' or 'unclaimed' on the Federal Government's

obligations only underscores the conflict between federal and state law, in which federal law must prevail.").

Plaintiffs also argue that Treasury has exceeded its authority by reviewing state court proceedings for compliance with due process.  But Treasury explains that it does not "purport to reverse a state judgment based on the Constitution's Due Process clause."  Defs.' Reply 43. Rather, looking for "evidence . . . that the registered bond owner and others 'who may have an interest in the bond' had 'actual and constructive notice' of the escheat proceedings" enables the Department to "evaluate its own risk" of a conflicting claim from a "registered bond owner . . . who [might] later present [the bond] for payment having been unaware of the pending escheat proceedings."  Id. (quoting Rule at 80,263).  In other words, the Rule's so-called due process requirements are not aimed at implementing constitutional protections, but at facilitating reliable determinations of *abandonment*.  They ultimately protect the interests of Treasury—both in preventing the risk of conflicting claims for payment (or, at least, litigation over conflicting claims), and in defining the parameters of Treasury's contracts with bondholders.  For these reasons, the Rule does not cross fundamental jurisdictional lines or engage Treasury in the business of constitutional interpretation and enforcement.

E.   Whether the Rule Violates the Tenth Amendment[13]

Under the Tenth Amendment, "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the

---

[13] Treasury argues that Plaintiffs' Tenth Amendment claim was waived because it was not presented during the rulemaking process.  Defs.' MSJ 29; Defs.' Reply 36.  But the State Treasurers—while not expressly invoking the Tenth Amendment—did voice the concern that the Rule would "harm the 'integrity, dignity, and residual sovereignty of the States,'" citing Supreme Court cases that sound in Tenth Amendment doctrine.  A.R. 85 (State Treasurers' Comments) (quoting Shelby County, Ala. v. Holder, 133 S. Ct. 2612, 2623 (2013) and Bond v. United States, 131 S. Ct. 2355, 2364 (2011)).  This provided the agency "a fair opportunity" to respond to

people." U.S. Const. amend. X.  As a final challenge, Plaintiffs posit that the Rule violates this principle by "encroaching on [states'] sovereign rights," particularly the ability to "[r]egulate the disposition of abandoned property."  Pls.' Cross-MSJ 43.

While disposing of abandoned property may generally be a state matter, "any state law, *however clearly within a State's acknowledged power*, which interferes with or is contrary to federal law, must yield" in accordance with the Supremacy Clause.  Free, 369 U.S. at 666 (emphasis added).  The Constitution expressly grants Congress the power "[t]o borrow Money on the credit of the United States," art. I, § 8, cl. 2, and "to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States," art. IV, § 3, cl. 2.  In turn, Congress has authorized Treasury to issue savings bonds and to promulgate regulations governing the terms of their ownership.  See 31 U.S.C. § 3105(a)–(c).  "So long as an agency has statutory authority to issue regulations, those regulations will preempt inconsistent state statutes by the simple operation of the Supremacy Clause."  Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd., 856 F.2d 1558, 1560 (D.C. Cir. 1988).

The Tenth Amendment applies only to "powers not delegated to the United States by the Constitution."  U.S. Const. amend. X.  Plainly, the Rule was promulgated in accordance with an

---

Plaintiffs' Tenth Amendment challenge, thereby preserving it for judicial review.  See National Corn Growers Ass'n v. EPA, 613 F.3d 266, 273 (D.C. Cir. 2010).

enumerated power—i.e., one that *was* constitutionally delegated.  Accordingly, Plaintiffs' Tenth Amendment challenge fails.

## IV.     Conclusion

For the reasons outlined above, the Court will grant Treasury's motion for summary judgment and deny Plaintiffs' cross-motion.  An Order accompanies this Memorandum Opinion.



CHRISTOPHER R. COOPER
United States District Judge

Date: <u>November 28, 2016</u>